Patricia D. KEARNEY, Plaintiff,

v.

PRUDENTIAL–BACHE SECURITIES, INC. and Bache Halsey Stuart Canada, Ltd., Defendants.

No. 84 Civ. 1625 (MBM).

United States District Court, S.D. New York.

Nov. 28, 1988.

---

Margaret E. Haering, Susan Paradise Baxter, Cole, Raywid & Braverman, Washington, D.C., for plaintiff.

Joel M. Miller, William A. Jacobson, Miller & Wrubel, P.C., New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Patricia Kearney sues to recover damages for violations of §§ 4b, 4d and 9(a) of the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 6b, 6d and 13(a) (Supp. IV 1986), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988), as well as common law fraud and conversion. Defendants Prudential–Bache Securities, Inc. and its Canadian affiliate, Bache Halsey Stuart Canada, Ltd., have moved for summary judgment. For the reasons set forth below, summary judgment is granted.

Plaintiff contends principally that her broker at Bache, Gale H. Hedrick, misrepresented the tax status of her commodities futures accounts. Specifically, Hedrick allegedly told her that she need not liquidate her open commodities futures positions in order to realize a loss for tax purposes. To counter the loss she had incurred, he suggested that she sell stocks on which she had realized a gain. However, because no loss on commodities trading is realized for tax purposes until the position is closed out, plaintiff was not able to offset the stock gains and thus became liable for $647,912 in income taxes. Additionally, plaintiff alleges that defendants breached their fiduciary duty by recommending these and other commodities futures transactions which were not suitable for her, by increasing her listed net worth improperly so as to raise the limits of her trading, and by falsely representing that Hedrick would continue to supervise her accounts after they were transferred from Chicago to the Toronto office. Finally, plaintiff claims that defendants improperly withdrew approximately $200,000 from her treasury bill account, although the funds were later restored.

The complaint sets forth seven separate claims for relief, but they are all based on essentially three discrete events: the incorrect tax advice Hedrick gave her regarding the taxability of the loss she had incurred on her sugar futures; Hedrick's and Bache's failure to supervise her account when it was transferred to Toronto coupled with the increase on her net worth statement; and the temporary disappearance of funds from the treasury bill account. The claims based on these events—denominated counts—are arrayed as follows: Count I asserts a violation of § 4b based on the consequences of the erroneous tax advice;

that section bars fraud by brokers in connection with commodities trading. Counts II, III and IV demand consequential damages resulting from the temporary disappearance of the treasury bill account and assert, respectively, violations of §§ 4b, 4d and 9(a); the latter two sections bar unauthorized transfer of funds and conversion. Count V is the broadest; it alleges a breach of fiduciary duty in violation of § 4b based not only on the consequences of the erroneous tax advice and the temporary disappearance of the treasury bill account, but also on recommendation of unsuitable investments and trading, and Hedrick's and Bache's failure to supervise and monitor her account. In Count VI plaintiff asserts a violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, which prohibit fraud in connection with securities transactions, because plaintiff was induced to sell securities to meet margin requirements in her commodities account that would not have arisen but for the erroneous tax advice, and did so when the treasury bill account, which otherwise would have been used for that purpose, was unavailable. Finally, Count VII asserts common law fraud arising from all of defendants' alleged misdeeds set forth in the other claims.

### I.

The facts, viewed in the light most favorable to the plaintiff, are set forth below.

Plaintiff opened a securities account with Bache's Chicago office in the mid–1950's, and by 1965 had begun trading in commodities, apparently at the urging of Hedrick.[1] She moved to Toronto in 1968, when her husband relocated his business.

---

1. Commodities trading involves contracts for future delivery of commodities where the trader commits to deliver or accept the underlying commodity at a fixed date in the future. Because these transactions are usually settled by an offsetting contract before the delivery date, they involve at least two transactions. Profits are made or losses are incurred as a function of the price differential between the original and the offsetting transaction. Only a small margin, anywhere from 5% to 20% of the total contract value, is deposited to secure the contract. As the price of a commodity futures contract fluctuates, the amount of equity in the customer account increases or decreases in proportion to the price change. If the equity in a customer's account declines beyond specified limits, the customer will receive a margin call. If the customer fails to meet a margin call he is subject to liquidation of the position and immediate loss.

In late 1979, Hedrick told plaintiff that she would no longer be permitted to trade commodities with him through Bache's Chicago office because Canadian law prohibited a Canadian resident from trading through a non-Canadian brokerage firm. Plaintiff, however, wished to have Hedrick continue to handle her accounts. Hedrick told her that he could retain some control over the accounts, but that the orders would have to be placed through a broker in Toronto. Thus, plaintiff opened a new commodities account at the Toronto office of Bache Halsey Stuart Canada, Ltd., a subsidiary of Bache Group, Inc. Alexander Optis, an account executive in the Toronto office, was assigned to her account.

The securities account remained in the Chicago office, but only after plaintiff had provided Hedrick with a United States address in order to circumvent the Canadian law. Plaintiff gave him the address of an Arkansas motel owned by her grandmother's trust. This arrangement created problems because her account statements were often opened or misdirected, and the practice was eventually abandoned in 1982.

Two months after plaintiff's commodity account was opened in the Toronto office, she was asked to sign a risk disclosure statement. That statement listed plaintiff's net worth as in excess of $750,000 and her liquid assets in excess of $500,000. Plaintiff charges that the figures filled in by Optis were based on unrealized profits from her commodities account and thus were not an appropriate measure of net worth, because price fluctuations could wipe out gains very quickly. Nevertheless, plaintiff signed the statement. In addition to the net worth information, the document also averred that "I [Kearney] recognize the inherent risks and high leverage associated with trading commodity futures.... I believe speculating in commodity futures is a suitable trading vehicle for me." (Miller Aff., Exh. 5).

According to plaintiff, however, the arrangement with Hedrick and Optis was not satisfactory because Hedrick failed to supervise her account properly. He did not receive on a regular basis the daily equity and margin statements showing the status of plaintiff's commodities account. Nor did Bache have any online system whereby Hedrick could obtain current information on her Toronto account. Hedrick was also "frequently" out of the office and began to take long vacations.

Plaintiff alleges that in 1980, the volume of trading in her commodities account exceeded the level of trading in all prior years. During the first few months of 1980, Bache's credit department contacted Hedrick and Optis urging them to take steps to bring the level of trading in plaintiff's commodity account within its established credit line of $25,000. Such limits are established to protect the brokerage house from exposure to loss if the customer cannot meet margin calls.[2] In May 1980, Hedrick prepared a financial statement which plaintiff claims misrepresented her assets in order to convince Bache's commodity credit committee to increase her credit line to $500,000. In June 1980, a credit line of $500,000 was authorized for the account, but plaintiff was never informed of this increase. Plaintiff asserts this increase in her credit line "set the stage for the financial disaster that befell her" because it virtually eliminated the opportunity for Bache management to supervise trading in her account.

At the end of November 1980, plaintiff was long 33 contracts of May 1981 sugar and short 33 contracts of March 1981 sugar. Although she was losing money on the May sugar contracts as the price continued to fall, Hedrick told her to hold them because the price would soon rebound. As of December 31, 1980, plaintiff had unrealized losses of $553,537 on the open sugar contracts in her commodities account. Hedrick reviewed the status of her accounts at year-end. When plaintiff expressed concern about the size of the loss on the sugar contracts, Hedrick told her not to worry

---

**2.** A purchaser or seller of a commodity futures contract must supply initial margin which generally is less than ten percent of the face value of the contract. If the market moves against the position, "variation" margin is required to maintain the initial margin.

because she had already taken the loss and mentioned securities she could sell at a profit to offset it. He also expressed confidence that sugar prices were rising. Sugar prices, however, continued to fall and, in January 1981, the sugar contracts were finally closed out for a loss of $678,928.

In May 1981, her tax accountants Arthur Andersen & Co. began working on her U.S. income tax return. Plaintiff then was told, apparently for the first time, that the unrealized losses on the open sugar contracts could not be used to offset gains that had accrued in the sale of securities. Rather, her tax accountants explained that losses on commodities contracts were not "realized" for tax purposes until the contracts were closed out. As a result, plaintiff was liable for taxes of $647,912 on the capital gains in her securities account. At Hedrick's suggestion, she attempted to treat herself as a commodities dealer on her 1980 income tax return to carry back her 1981 sugar contracts losses. Her accountants decided that this creative solution would not be acceptable to the IRS and she filed an amended return. She was also forced to liquidate profitable stocks in order to meet variation margin calls resulting from the losses. Plaintiff continued trading until 1983 in order to recoup her losses. Hedrick assisted her, as always, making frequent recommendations. He also sought to assist her in her tax problems, at one point arranging a meeting between plaintiff and lawyers knowledgeable in the tax field.

The alleged disappearance of money from plaintiff's commodities account arose from an apparent office error. In early 1980, Hedrick and Optis suggested plaintiff place excess equity from her commodities account into treasury bills. Once this was accomplished, her commodities account statements showed transfers of nearly $200,000 to her securities account. Treasury bills were in fact bought in her name, but no statements were provided until 1981. After this error was discovered, Bache paid $200,000 into her securities account on April 30, 1981 and provided $23,-633 in interest for the period from the purchase of the treasury bills until statements reflected their presence in her account. Plaintiff claims that the temporary disappearance of the money made it unavailable to meet a variation margin call, and that she had to sell securities instead.

## II.

Section 4b[3] of the Commodities Exchange Act mandates that the alleged fraud be "in connection with" an order to make or the making of a "contract of sale of any commodity." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 109 (2d Cir.1986). In order to state a claim under both § 10(b)[4] and Rule 10b–5,[5] the fraud alleged must be

---

3. Section 4b provides that: "It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, [on or subject to the rules of any contract market,] for or on behalf of any other person, or (2) for any person, in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, ...
 (A) to cheat or defraud or attempt to cheat or defraud such other person;
 (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract or in regard to any act of agency performed with respect to such order or contract for such person...."
 7 U.S.C. § 6b (Supp. IV 1986). Congress in 1986 deleted the bracketed language; this change, however, does not concern us here.

4. Section 10(b) reads in pertinent part: "It shall be unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance ..." 15 U.S.C. § 78j(b) (1982).

5. Rule 10b–5, as promulgated by the Securities and Exchange Commission, provides in pertinent part: "It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make untrue statement of a material fact or to omit to state a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were

"in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b) (1982); 17 C.F.R. § 240.10b–5 (1988). Thus, a plaintiff must show both a transaction (the order or the making of the contract), and a link between the fraud and the transaction (that the fraud was "in connection with" the transaction).

### A. *The Transaction Requirement*

■ Defendants argue that § 4b's focus on "any order to make, or the making of, any contract of sale of any commodity," is analogous to § 10(b)'s focus on a "purchase or sale" in that both sections require a plaintiff to prove that his losses resulted from a transaction. In particular, defendants note that the Supreme Court has held that a fraud inducing an investor *not* to sell fails to meet the test of a "purchase or sale," and is not compensable under § 10(b). *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926–27, 44 L.Ed.2d 539 (1975); *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). Because the fraudulent tax advice is alleged to have induced plaintiff only to hold her sugar futures, rather than to buy or sell, defendants claim that such fraud is not actionable. I agree.

■ Plaintiff asserts that the language of the CEA and the different realities of the commodities markets demonstrate that Congress did not intend so to restrict § 4b.

Futures contracts are not "traded" like securities; rather, they are formed and discharged as a trader "liquidate[s] his open position by entering into another equivalent futures contract on the other side of the original position prior to the expiration of that contract." (Complaint ¶ 8). Plaintiff is right that commodities markets operate differently, but wrong when she assumes that this difference makes a transactional "purchase or sale" requirement impossible. Rather, it seems that Congress chose the language, "order to make or the making of a contract," in explicit recognition that every commodities sale involves a purchase, and thus that the operative method of transacting is the "making" of a contract. The language of the CEA thus reflects an apparent Congressional intent to cover only losses that result from a commodities transaction—the "making" of a contract.[6]

Both the language of other sections of the CEA and the statute's legislative history bear this out. As is true of the securities laws, *see Blue Chip*, 421 U.S. at 756, 95 S.Ct. at 1935, Congress employed broad language in the CEA when it wished to curtail a broad range of anti-fraud activities. Thus, § 4o of the CEA forbids "commodity trading advisors"[7] and "commodity pool operators" from "employ[ing] any device, scheme, or artifice to defraud any client or participant or *prospective* client or participant; or . . . engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon

---

made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1988).

**6.** Although the language of § 4b is not limited to the "making" of a contract, and includes also the phrase "order to make," this phrase covers the case in which the plaintiff places a formal order, but the defendant does not effect the transaction. *See* 1 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud*, § 4.6(462)(5) (1979) ("It is certainly enough that plaintiffs have parted with money to make commodity transactions, though the transactions did not take place.") This phrase does not indicate that Congress intended the anti-fraud provision to reach beyond such a case.

**7.** The CEA defines a commodity trading advisor as one who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value of or the advisability of trading in any contract of sale but who is not, among others, a futures commission merchant. 7 U.S.C. § 2. Futures commission merchants, such as the defendants here, are engaged in soliciting or accepting orders for the purchase or sale of any commodity for future delivery. *Id.* Finally, a commodity pool operator is engaged in an investment trust, syndicate, or similar form of enterprise and solicits, accepts, or receives funds, securities, or property for the purpose of trading in any commodity for future delivery. *Id.*

any client or participant or *prospective* client or participant...." 7 U.S.C. § 6*o* (1) (emphasis added). Not only did Congress in § 4*o* explicitly include "prospective" clients and participants, but Congress also omitted any language limiting coverage of that section to fraudulent practices in connection with a contract or an order to make a contract of sale. Thus, Congress made a determination that a small group of advisors, those *not* involved in the making of contracts, posed such a threat that a broadly worded statute was necessary to protect investors.

The legislative history, although sparse, demonstrates that Congress expressly singled out trading advisors and pool operators for such broad gauge liability. Before 1974, such persons were not explicitly covered by the CEA's registration requirements, unlike commodities merchants, such as defendants here. As Senator Poage said at the time, the 1974 amendments, which included § 4*o*, were intended to insure that such advisors "be brought within the purview of the Act." 119 Cong.Rec. 41334 (1973). The 1974 amendments, however, were not the first effort to rein in advisors. Indeed, there are indications that clause 2 of § 4b, which forbids "any person" from committing a fraud in connection with any transaction and which was added in 1968, was an earlier effort to control commodity advisors. *See* 1 Bromberg & Lowenfels, § 4.6(452) at 82.287 ("Clause (2) ... was apparently aimed mainly at commodity advisors.") As the Senate Report at the time indicated, "the present [pre–1968] language makes [cheating, etc.] unlawful only if done by members of contract markets or their correspondnets, agents or employees. Not now covered are, for example, persons providing certain types of advisory services which direct trading for customers and often trade for their own account as well, dealing through contract market members. Section 5 [of the bill] would extend the act to cover such persons." S.R.Rep. No. 947, 90th Cong., 2nd Sess. 6 (1968), *reprinted in*, 1968 U.S. Code Cong. & Admin.News 1673, 1678.

Although the legislative history of the 1974 amendments does not expressly so state, it seems virtually a truism that Congress felt further protection was warranted and therefore added § 4*o*. No similar changes were made in § 4b. Indeed, Congress in 1974 expressly refused to alter § 4b's language, although there was a proposal at the time to write § 4*o*'s broader language into § 4b. *See Hearings on S. 2485 and H.R. 13113 Before the Senate Comm. on Agric. and Forestry*, 93rd Cong., 2nd Sess. 718, 729 (1974) (statement of Jerome P. Weiss). *See generally*, 1 Bromberg & Lowenfels, § 4.6(452) at 82.-288–89. Accordingly, there is no reason to read § 4b more broadly than its language suggests.

Plaintiff's final argument against reading § 4b to impose a transactional requirement is that there is no need to restrict liability under § 4b as there is under § 10(b), because the universe of potential defendants under § 4b is already restricted to commodities merchants who defraud their customers. Accepting for the moment plaintiff's implicit contention that judicial interpretation of § 10(b)'s anti-fraud provisions to require a purchase or sale was driven solely by the perceived need to restrict an overly broad statute, plaintiff's contention is without merit. Although the language of § 4b is far from clear in this regard, Judge Friendly has explicitly rejected the notion that § 4b liability is limited to customer-broker relationships. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir.1980). Judge Friendly found that liability may attach against anyone who defrauds a broker executing a transaction for a customer. Additionally, "[t]he applicability of § 4b may well extend even further, since it could be argued that one trading for his own account makes a contract 'for' himself, thus bringing fraud between two principals within the confused language of § 4b." *Leist*, 638 F.2d at 322. Thus, the world of both potential plaintiffs and potential defendants under § 4b is not as limited as plaintiff claims, and provides no basis for reading § 4b of the CEA to cover claims that would be barred if they involved securities and were brought under § 10(b) of the Securities Exchange Act.

Rather, to the extent that Congress was concerned with protecting commodities investors, it appears to have followed generally the pattern of the securities laws.[8] *See generally, Rinfret, Inc. v. Drexel Burnham Lambert, Inc.,* 661 F.Supp. 611, 614 (S.D.N.Y.1987) (Weinfeld, J.). Thus, the two bodies of law, whenever possible, should be read to provide similar coverage. It follows that, absent some indication that plaintiff made a contract of sale, no recovery is possible. With regard to the tax advice, plaintiff claims that she held the sugar futures because Hedrick advised her that she had already taken the loss on them. Such fraudulent inducement not to sell is outside the scope of § 4b. *Cf., Goldman v. A.G. Becker,* [1982–1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,172 at 95,655 (S.D.N.Y.1983).[9]

■ In sum, plaintiff's claim for damages from the greater losses incurred on her sugar futures because she was induced to hold them until January 1981 is not actionable because no order or contract for sale was made. Accordingly, insofar as plaintiff's Counts I and V assert violations of § 4b based on Hedrick's erroneous tax advice, they cannot stand.

B. *The "In Connection With" Requirement*

However, the absence of an order or contract is not the only barrier to plaintiff's

recovery for Hedrick's allegedly fraudulent tax advice. Even if § 4b were read to cover a claim for damages that resulted from holding rather than making a commodities contract, Hedrick's tax advice could not give rise to a claim for fraud "in connection with" holding such a contract.

Courts generally have applied interpretations of the "in connection with" requirement of § 10(b) of the Securities Exchange Act of 1934 when interpreting the same phrase in the Commodities Exchange Act. *Saxe,* 789 F.2d at 109; *Rinfret,* 661 F.Supp. at 614.

■ To satisfy the "in connection with" requirement, plaintiff may not allege fraudulent acts which merely happened to involve commodity futures in some way. The "in connection with" requirement mandates that the alleged fraud concern the fundamental *nature* of the commodity futures contract: namely, the characteristics and attributes that would induce an investor to buy or sell the particular commodity futures contract.

■ In *Rinfret,* Judge Weinfeld dismissed a § 4b claim that defendant had fraudulently misstated the commissions charged on an account precisely because such a claim did not meet the "in connection with" requirement. Surveying case

---

**8.** Although the legislative history is once again sparse, Congress appears to have intended that the anti-fraud provisions of the CEA be the same as those of the securities laws in order to prevent unscrupulous participants from switching from the securities markets to the commodities arena. The House Report for the 1936 amendments, which included § 4b among other additions, stated that "[s]ince the passage of the Securities Exchange Act of 1934 there has been ... an increasing tendency on the part of professional speculators to transfer their activities from the security markets to the commodity markets, a tendency which makes the enactment of this bill without further delay of vital importance." H.R.Rep. No. 421, 74th Cong., 1st Sess. 2 (1935). The Report also quoted at length President Roosevelt's message to Congress in which he recommended legislation to regulate "the operations of exchanges dealing in securities *and* commodities for the protection of investors...." *Id.* (emphasis added). *See also* 79

Cong.Rec. 8589 (1935) (statement of Rep. Jones).

**9.** Although case law provides a narrow exception when a plaintiff evinces a present intention to sell securities and is thereafter induced to retain them, *Rich v. Touche Ross & Co.,* 415 F.Supp. 95, 100 (S.D.N.Y.1976), plaintiff's deposition indicates that she never explicitly told Hedrick in December 1980 that she wished to close out her position in sugar futures. She recounts that when he told her of her loss, she "felt devastated and everything," and he said, "Forget it, you've already taken the loss." (Kearney Dep. at 109). Given that this exception could easily erode the *Blue Chip* principle, I decline to construe plaintiff's devastation over her losses as indicating an explicit order that Hedrick close out her position. *See Baum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518, 1526 (S.D.N.Y.1986) (Leisure, J.) ("[A]dherence to the exception delineated in *Rich* ... is all but extinct.").

law under § 10(b), Judge Weinfeld concluded that:

"[i]n general, misrepresentations concerning the mechanics of a securities transaction, without particular regard to the nature of the securities themselves, have not been held actionable.... While courts have recognized causes of action under the CEA for churning and unauthorized trading, neither of which concern the nature of the commodities traded, both of those causes of action involve breaches of a broker's duty to execute only those trades that will benefit the client, and, in the case of unauthorized trading, have previously been cleared with the client."

*Rinfret,* 661 F.Supp. at 614.

In *Saxe,* the Second Circuit affirmed a district court's dismissal of securities law claims where an investor claimed that he was fraudulently induced to liquidate a stock portfolio in order to invest funds in commodity futures. Citing its decision in *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed. 2d 190 (1984),[10] the court found that "Saxe did not allege that appellees misled him concerning the value of the securities he sold or the consideration he received in return." *Saxe,* 789 F.2d at 108–109. The court held that misrepresentations regarding commodities trading were too far removed from the sale of securities to state a claim under federal *securities* laws, but that the "in connection with" requirement for federal *commodities* law violations was

satisfied with respect to the broker's alleged misrepresentations about the "degree of risk and highly speculative nature of commodities trading...." *Saxe,* 789 F.2d at 110.

Courts have found that misrepresentations regarding commissions are not actionable for failure to satisfy the "in connection with" requirement, *Williamsport Firemen Pension v. E.F. Hutton & Co.,* 567 F.Supp. 140 (M.D.Pa.1983); *Moran v. Kidder Peabody & Co.,* 617 F.Supp. 1065 (S.D.N.Y.1985), *aff'd mem.,* 788 F.2d 3 (2d Cir.1986), but material misrepresentations going to the risks involved or investment characteristics or quality of transactions are actionable. *Manufacturers Hanover Trust v. Drysdale Sec. Corp.,* 801 F.2d 13, 22 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (misrepresentations regarding financial stability of new brokerage house trading in repurchase agreements or "repos"); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (misrepresentations regarding experience of broker handling the account); *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96, 98 (7th Cir.1977) (failure to advise of high risk of commodity trading actionable); *O'Hey v. Drexel Burnham Lambert, Inc.,* [1984–86 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 22,390 at 29,799 (CFTC ALJ Oct. 17, 1984) (misrepresentations as to the risks involved in gold spreads).

---

**10.** The court in *Chemical Bank* also said that the "in connection with" test requires a showing of loss causation. *Chemical Bank,* 726 F.2d at 943 & n. 23. Yet loss causation is basically a tort concept of proximate cause—whether the misrepresentation induced the loss, *see Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 85–6 (2d Cir.1988) (loss not actionable because misrepresentation was cured before the sale), and therefore can be proved by a showing that is different from what is necessary to prove fraud "in connection with" a transaction. As a practical matter, however, the "in connection with" test shares with loss causation the requirement that the fraud alleged be closely enough linked to the commodities transaction that an observer could conclude that the fraud caused the transaction. However, the "in connection with" test goes

further and demands more than just mere proximity: the fraud must concern the very nature or characteristic of the securities or commodities at issue. Tracking these two concepts are two essentially complementary strains in judicial interpretation of the "in connection with" requirement: one is time-oriented, *e.g., Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985 (S.D.N.Y.1984) (misrepresentation regarding settlement negotiations undertaken after a commodities account was closed and all trading ceased not actionable), while the other involves an inquiry into whether the misrepresentations concern the fundamental nature of futures contracts or securities, such as the risks inherent in futures trading, *e.g., Rinfret,* 661 F.Supp. at 614. The case at hand involves the latter inquiry.

These cases teach that, in order for a misrepresentation to be actionable under the Securities Exchange Act and the Commodity Exchange Act, it must be fundamental to the nature of a particular securities or commodity trading device. Here, accepting as true plaintiff's version of events, Hedrick's tax advice related solely to plaintiff's ability to offset a prior gain by open losses in the same year, as follows:

Q Do you remember Mr. Hedrick advising you to sell all your sugar contracts, close out the contracts in 1980 and your refusing to do that?

A Oh, no, that never happened. There's no way of that happening. He phoned me in—I don't know the date—I guess it was December, 1980, and he said, "No, Pat, we have to think about the year end and the tax and how this will be handled," and he said, "You have a big loss, a huge loss. So, you should sell something, some stocks that you have profits on, to offset it." And I said, "Oh, that's a terrible loss on the sugar contracts." And he said, "Pat, forget it. You already taken the loss." And I knew that Bache had taken it out of the account, and so he suggested different stocks to sell, that I had to sell for a margin requirement, he said.

. . . .

Q I don't understand when you said Bache had already taken it out of the account. What did you mean by that?

A Well, I had a huge sugar loss in these contracts that were open, and Mr. Hedrick told me that I had already taken the loss and to forget it.

Q What did you understand him to mean when he said you had already taken the loss?

A That I had taken the loss.

Q What did you understand him to mean by that?

A That I had taken the loss and we discussed the fact that I had $100,000 carryover from a previous—$100,000 loss carried forward from a previous year, from way back, and there was

all these big losses; that I should sell something that I had a profit on. (Kearney Dep. at 101–103). Even assuming that Hedrick's statement was fraudulent, he did not misrepresent the underlying nature of the futures contract nor did he misrepresent a fundamental characteristic of the commodities traded. The tax advice was one step removed from the contracts themselves because it concerned the status of her portfolio, rather than, for example, the tax benefits accruing from a tax shelter. *Randall v. Loftsgaarden*, 478 U.S. 647, 669, 106 S.Ct. 3143, 3156–57, 92 L.Ed.2d 525 (1986) (Blackmun, J., concurring). If Hedrick had induced plaintiff to trade in commodities with the representation that such investment offered the possibility of recognizing losses for tax purposes without closing out contracts, the result might be different. But there is no suggestion he did that.

Plaintiff cites a decision on a Rule 9(b) motion for failure to plead fraud with particularity, *Zonszein v. Bache Halsey Stuart Shields, Inc.*, [1985–1986 Transfer Binder] Fed.Sec.L.Rep (CCH) ¶ 92,233 at 91,673 (S.D.N.Y.1985) [available on WESTLAW, 1985 WL 1819], for the proposition that a misrepresentation of "the tax implications of making a purchase of securities constitutes actionable fraud." The brokers in *Zonszein* allegedly misrepresented that plaintiffs, who were Mexican citizens, would not incur any tax liability if they purchased Eurobonds. But *Zonszein* does not support such a proposition. The court there ruled only on whether plaintiffs had pleaded fraud with particularity without reaching the question of whether plaintiffs met the "in connection with" tests.

In any event, the situation in *Zonszein* is distinguishable from the one at bar because the misrepresentation there went to the taxability of the securities for the clients involved, rather than to the status of the clients' portfolio at a particular time. Misrepresentations are actionable when they relate to facts which, if known to the prospective client at the time of sale, would prevent him from buying the securities involved. If the main purpose of a purchase

is to obtain a tax benefit, as with the *Zonszein* plaintiffs, then misrepresentations concerning the tax benefits go directly to the investment quality of the asset. *See, e.g., Laheney v. Murlas Brothers Commodities, Inc.,* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,044 at 24,130 (CFTC ALJ May 12, 1980) (failure to inform a customer that there were two "legs" to a tax straddle). Hedrick's advice did not go to the taxability of what was being traded such that it would affect a decision to buy or sell; rather, it went to the mechanics of obtaining a certain tax result by buying and selling concededly taxable commodities futures and stocks. In a very real sense, his comment was the type of pure tax advice one would normally obtain from a tax accountant, not from a commodities broker. Thus, although Hedrick's bad tax advice may have induced plaintiff to maintain her position, his advice is not sufficiently "in connection with" the purchase or sale of commodities to state a claim under § 4b.

### C. *Other Claims Under Section 4b*

■ To be sure, Hedrick's erroneous tax advice is not the only cause plaintiff has alleged for the losses in her commodities account that she believes are actionable under § 4b. In Count II, plaintiff alleges that sums were debited from her commodities account for transfer to her securities account, and were used instead to buy treasury bills in an account that was not credited to her until about a year later. This alleged treasury bill account misrepresentation does not relate at all to the nature of the commodities contracts.[11] Errors in properly crediting accounts might state a claim for breach of contract under state law, but are inadequate to support a claim for fraud. *Zonszein,* Fed.Sec.L.Rep. (CCH)

¶ 92,233 at 91,677. The same holds true for Bache's inadvertence in failing to provide any statements on that account.[12]

■ As part of Count V, plaintiff asserts fraudulent misrepresentation by defendants as to the degree to which Hedrick would continue to serve as her broker, as well as failure to monitor her account, with resulting losses in trades. This supplies the necessary order or contract, and so I must consider whether such alleged conduct may be said to constitute fraud "in connection with" an order or contract. Plaintiff argues vigorously that misrepresentations regarding Hedrick's failure to supervise the account state a claim for relief, citing dictum in *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1044 n. 5 (2d Cir.1983), which indicated that "material misrepresentations about the nature of [an] organization handling [an] account, *the people [dealt] with,* and the type of trading [the] funds were being used for" (emphasis added) would be sufficient. Although the *Psimenos* court never reached this issue, the kind of misrepresentation the court was addressing raised basic questions as to the over-all competence of the employees, *see, e.g., Marbury Management,* 629 F.2d 705, rather than which of a number of concededly competent people would actually handle the account. *See Frota v. Prudential–Bache Sec., Inc.,* 639 F.Supp. 1186, 1190 (S.D.N.Y.1986) (claims of a false promise that a trusted advisor of clients would manage the account were dismissed under § 10(b) and Rule 10b–5); *see also Pross v. Katz,* 784 F.2d 455, 458–59 (2d Cir.1986) (false promises faithfully to manage an account are not fraud "in connection with" the purchase or sale). Here, the misrepresentation made was that Hedrick would

**11.** Additionally, the diversion of these funds can in no way be deemed conversion or theft within the meaning of either provision of the Commodity Exchange Act barring such misconduct, 7 U.S.C. § 6d and § 13a (1982). Bache's records show that a treasury bill account in Kearney's name was maintained in the New York office. Even if I were to accept plaintiff's rather farfetched accusation that these records were created after the fact, Bache promptly credited Kearney's securities account and provided inter-

est for the time period. Thus, plaintiff's claims in this regard are without merit.

**12.** Plaintiff also refers to the loss of securities account statements which were sent to plaintiff's Arkansas address but never received by her as evidence of fraud. Given that plaintiff supplied this address, I cannot see how even a dubious attempt to accommodate a client can demonstrate fraud.

continue to supervise plaintiff's account. No allegation has been made, however, that the other broker involved, Optis, was incompetent. Thus, even assuming that Hedrick was derelict in failing to monitor her account, those misrepresentations are, in reality, more a breach of contract than a fraud.

Plaintiff, however, alleges further in Count V that Bache and its agent, Hedrick, were in a fiduciary relationship with her because of their control over her account and that they negligently failed to supervise her assets. Putting aside for a moment whether such a relationship existed, there is the yet more basic issue of whether negligence is covered by § 4b. Both the plain language of that section and case law in this circuit answer that question with a resounding "no." The language at issue is set forth in the margin at note 3, *supra*. As Judge Rubin pointed out in *McCurnin v. Kohlmeyer & Co.*, 347 F.Supp. 573, 576 (E.D.La.1972), *aff'd*, 477 F.2d 113 (5th Cir.1973), the statute "does not use sweeping terms. Its pejoratives are simple and pointed: it uses the words 'cheat' and 'defraud' and 'willfully.' By any definition these connote deliberate acts or a degree of negligence that is so gross as to approach willfulness. This interpretation is strengthened by the fact that criminal penalties are attached to a violation of Section 6b, 7 U.S.C. § 13." *See also, Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 283 (9th Cir.1979); *Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352, 1356 (10th Cir.1978).

Further, in *Haltmier v. CFTC*, 554 F.2d 556, 562 (2d Cir.1977), the Second Circuit determined that "evil motive" was not necessary to allege a § 4b violation, holding, "[i]t is enough that he [the broker] acted *deliberately, knowing* that his acts were unauthorized and contrary to instructions. *Such knowing, intentional conduct made*

*his acts willful*, and therefore his violations of the statutory prohibition against cheating or defrauding the customer were willful, in the accepted sense for infractions of this type." (emphasis added) This language would seem to preclude a negligence claim and instead require a scienter or intent-based standard similar to the test for § 10(b) claims, *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), and Rule 10b–5 actions, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).[13] *Cf. Merrill Lynch Futures Inc. v. Kelly*, 585 F.Supp. 1245, 1252 (S.D.N.Y.1984) ("In order to have violated the Act, it is not necessary for the defendants to have had an intention affirmatively to injure ... It must appear, however, that the deceptive acts were intentional and that the defendants recognized their fraudulent character.")

The Commodity Futures Trading Commission has held that a negligent breach of fiduciary duty by an account executive is constructive fraud in violation of § 4(b). *Gordon v. Shearson Hayden Stone, Inc.*, [1980–1982 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,016 at 23,973 (CFTC, 1980). But the Commission's view has not met with approval in the federal courts. Indeed, other circuits considering this question have refused to extend § 4b to include mere negligence or breach of fiduciary duty. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904 (7th Cir.1988) (Posner, J.) ("for commodities, negligence is not enough"); *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 822–23 (10th Cir.1986); *Horn v. Ray E. Friedman & Co.*, 776 F.2d 777, 780 (8th Cir.1985); *First Commodity Corp. v. Commodity Futures Trading Commission*, 676 F.2d 1, 4–5 (1st Cir.1982).

Four cases cited by plaintiff in support of her position concern either a broker's failure to disclose that he had a financial interest in the security which was pur-

---

**13.** Although *Haltmier* did not explicitly refer to the *Hochfelder* language, the court's discussion tracks the concept of scienter as defined by the Supreme Court in that case. Considering that *Haltmier* was decided a year after *Hochfelder*, and weighing the other factors set forth herein, including particularly the statutory language, I believe it is safe to conclude that the two standards are the same. To the extent that *Herman v. T & S Commodities, Inc.*, 578 F.Supp. 601, 604 n. 4 (S.D.N.Y.1983), suggests otherwise, I respectfully differ.

chased or sold, *see Chasins v. Smith Barney & Co.,* 438 F.2d 1167 (2d Cir.1970); *Cant v. A.G. Becker & Co.,* 374 F.Supp. 36 (N.D.Ill.1974); *Courtland v. Walston & Co.,* 340 F.Supp. 1076 (S.D.N.Y.1972), or involve a broker who assumed responsibility for an estate by telling its executor that a lawyer was not necessary to administer the estate and then placed the estate's assets into risky commodities trading, *Carras v. Burns,* 516 F.2d 251 (4th Cir.1975). No case stands for plaintiff's assertion that breach of fiduciary duty states a claim under § 4b. Both precedent and the compelling logic of applying the securities and commodities laws uniformly support the conclusion that absent some evidence of scienter or intent, no violation for breach of fiduciary duty is actionable under § 4b. Thus, plaintiff's claim must fail here as well.

■ Plaintiff's allegations regarding the mishandling of her accounts, including Hedrick's recommendations to continue trading after the sugar contracts had been sold, his inflation of her net worth on the financial statement for Bache's commodity credit committee, and her claim that she was interested only in "safe" investments, all seem to be based on a "suitability" claim: namely, that Hedrick invested in risky transactions contrary either to her explicit directions or to her interests.

Given plaintiff's extensive trading history in a variety of risky transactions, from securities to physical metals, her acknowledgment in writing that she recognized "the inherent risks and high leverage associated with trading commodity futures" and her determination that "I believe speculating in commodity futures is a suitable trading vehicle for me," (see pp. 420–21, *supra*) such claims based on failure to follow explicit direction are utterly undone by the evidence presented on this motion. Although the *Hochfelder* standard permits scienter or intent to be proved by circumstantial evidence, *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 756 (2d Cir. 1986), *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984), the circumstances must in fact prove such intent; plaintiff's

claim here again is fatally undermined by the evidence in this case. It is undisputed that plaintiff signed a risk disclosure statement, consulted frequently with the account executive regarding the trading, and was aware she could—and, in fact, did—reject advice. According to her deposition, plaintiff regularly received confirmation slips and monthly account statements for the Chicago and Toronto accounts. Plaintiff organized the confirmations by month and, if there was a discrepancy, compared the confirmations with her own notes and discussed the discrepancy with Hedrick.

Q Did you find discrepancies from time to time?

A Yes. There would be something I would have to talk to Mr. Hedrick about.

Q When you found a discrepancy, you raised it with Mr. Hedrick?

A Sometimes he bought stocks in my account that I didn't want and I told him, and he would take it out.

(Kearney, Dep. at 94–96).

Plaintiff regularly read the business section of major Chicago and Toronto newspapers to check commodity futures trade prices and articles about commodities. Moreover, plaintiff had over 15 years of commodity futures trading and 25 years of general investing experience. From at least 1973 through 1983, plaintiff traded physical metals on margin accounts through a company affiliated with Prudential–Bache. From 1971 to 1979, in trading through Prudential–Bache alone, plaintiff traded 1,027 futures contracts in the Chicago futures accounts, 90,531 shares of stock in 154 transactions in the Chicago securities account, $305,000 face value in bonds in 11 transactions and 27 contracts in physical metals. Plaintiff also maintained securities trading accounts with other brokerage firms, including A.G. Edwards & Sons, Inc., Paine Webber Jackson & Curtis, Hornblower Weeks—Hemphill, Noyes, and Jones Gable & Co., Ltd. The A.G. Edwards account was a margin account. All these investments are high risk ventures for investors seeking a high return. Every indication is that plaintiff understood full

well both sides of this equation and took risks in accordance with what she believed were her best interests.

■ Moreover, both courts and the Commodity Futures Trading Commission have determined that there is no suitability rule under the Commodity Exchange Act. *Trustman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,936 at 90,671 (C.D.Cal.1985) [available on WESTLAW, 1985 WL 28]; *Applegate v. Dean Witter Reynolds*, [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,181 at 27,748 (S.D.Fla.1983); *Andregg v. Stotler and Co.*, [Current] Comm.Fut.L.Rep. (CCH) ¶ 23,963 at 34,362 (CFTC ALJ 1987) ("This Commission has determined that there is no suitability rule in the Commodity Exchange Act"). Hedrick's encouragement to plaintiff to continue trading after her losses also does not violate the Act absent some indication that it was done to generate commissions, *see, e.g., Moran*, 609 F.Supp. at 666, an argument which plaintiff has specifically declined to advance. That Hedrick's efforts to help plaintiff recoup her losses turned out badly does not prove that he intended them to fail, or that he neglected recklessly to do what he could.

Faced with this overwhelming evidence and authority, plaintiff presents only innuendo and surmise concerning Hedrick's inflation of her net worth on her financial statement for the credit committee. Accepting plaintiff's allegations regarding Hedrick's conduct as true, they point at best to mere inadvertence, but certainly not to the reckless disregard for plaintiff's interests under *Hochfelder* necessary to survive summary judgment. Rather, it seems that both were caught up in the successes plaintiff was realizing on sugar futures earlier in 1980. By November 1980, plaintiff had amassed $545,000 in profit in trading futures, most of which were sugar futures, at a time when sugar prices reached historic highs. The increase in her credit line enabled her to reap such gains. But, as the price declined, plaintiff suffered the heavy losses that form the basis for this action. The evidence shows that Hedrick was acting to promote what he conceived to be plaintiff's interests at all times. Indeed, plaintiff admits that Hedrick continued to assist her after the losses in various attempts to recoup the money, including attempting to introduce her to lawyers who could assist her.

■ Similar allegations have been dismissed by other courts as not stating a claim under § 4b. In particular, violation of internal margin rules have been held not actionable because inhouse rules "are established primarily to protect the broker by assuring sufficient collateral for credit extended to finance customer speculation." *Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F.Supp. 591, 596 (S.D.N.Y. 1981). *See also Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir.1971) (violation of margin agreement is "nothing more than a ... breach of contract"); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). Because such rules are designed to protect the broker and the brokerage house, Hedrick's falsification of plaintiff's credit statement exposed him and Bache to greater liability.

\* \* \*

■ Despite the legal and factual inadequacies outlined above, plaintiff insists that summary judgment is inappropriate where intent is a critical element of the claim. Although cases where state of mind is at issue are sometimes not ripe for summary judgment, the Second Circuit has held that "[s]ummary judgment is appropriate when the non-moving party has come forward with no evidence from which a reasonable fact-finder could find that the defendant had the requisite state of mind." *Mayer*, 803 F.2d at 756. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because plaintiff's evidence fails to raise even a hint of recklessness or careless disregard for plaintiff's interest required to state a claim for relief, summary judgment is warranted.

### III.

 In Count VI of her complaint, plaintiff asserts a violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder, claiming that the erroneous tax advice about commodities caused her to sell securities she would otherwise have retained. She claims also that the failure to credit to her securities account funds transferred from her commodities account and used to buy treasury bills which themselves were not credited in timely fashion, eventually forcing her to sell stock in order to meet a margin call, also violated § 10(b). These assertions are analogous to that of the client in *Saxe* who claimed he was fraudulently induced to liquidate his stock portfolio in order to invest the funds in commodities futures. 789 F.2d at 108. The court there found that the misrepresentations concerning the commodities bore too attenuated a relationship to the sale of *securities* to meet the "in connection with" requirement for securities fraud. Similarly, the misrepresentations here regarding the $200,000 in treasury bills or regarding the taxability of losses from the commodities account do not concern the nature of securities at all. Rather, they are too far removed from the later sale of stock in response to a margin call to be actionable.

### IV.

In sum, defendants' motion for summary judgment on the federal claims is granted in its entirety. I decline to exercise pendent jurisdiction over the state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See also Mayer*, 803 F.2d at 756–57; *McLearn v. Cowen & Co.*, 660 F.2d 845 (2d Cir.1981).

SO ORDERED.