because the withdrawing employer has undergone Chapter 11 or similar proceedings.

For the foregoing reasons the order of the district court is affirmed.

**Barry SAXE, Plaintiff-Appellant,**

**v.**

**E.F. HUTTON & COMPANY, INC., Scott A. Howard and Hanger Associates, Inc., Defendants-Appellees.**

**No. 932, Docket 85–9048.**

United States Court of Appeals, Second Circuit.

Argued March 25, 1986.

Decided April 23, 1986.

Howard D. Bader, New York City (Harvey L. Woll, Mannarino, Bader & Bloom, New York City, of counsel), for plaintiff-appellant.

Marc S. Dreier, New York City (Howard Schneider, Ethan V. Finneran, Rosenman Colin, Freund, Lewis & Cohen, New York City), for defendant-appellee E.F. Hutton & Co.

Richard S. Mezan, New York City (John H. Reichman, Pollner Mezan, Stolberg & Frechtman, P.C., of counsel), for defendant-appellee Hanger Associates, Inc.

Before KAUFMAN, TIMBERS and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We are called upon to review the dismissal of an investor's plea that certain investment advisors fraudulently lured him into the highly speculative area of commodities trading. Needless to say, this foray resulted in a financial disaster. Although the claim is all too familiar in the securities law context, here we consider it under the relatively unexplored anti-fraud provisions of

the Commodities Exchange Act. Mindful of the Supreme Court's admonition that a complaint should not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) unless it appears "beyond doubt that the plaintiff can prove no set of facts ... [entitling] him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), we reverse the judgment in part and remand for further proceedings.

Before proceeding to the substance of this appeal, we set forth the factual landscape as detailed in the complaint. In reviewing a dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), we accept the allegations in the complaint as true.

In May 1981, Barry Saxe ("appellant") opened a discretionary stock account with E.F. Hutton & Company, Inc. ("Hutton"), a securities broker-dealer and futures commodity merchant ("FCM"). Commencing in June 1982, Scott A. Howard, a Vice President at Hutton, called Saxe frequently to solicit his participation in specific investment programs offered by Hutton. Howard represented himself as "an expert in the field of money management." He held himself out to be more than an "ordinary" stockbroker.

By the end of 1982, appellant's stock account at Hutton had suffered drastic losses. No longer willing to tolerate the poor performance of his portfolio, Saxe sought Howard's advice on a "safe, conservative, nonspeculative type of investment program." Accordingly, Howard suggested to Saxe that he open an account with Hanger Associates, Inc. ("Hanger"), a registered commodities trading advisor. When Saxe expressed his apprehension over commodities trading, an area with which he was totally unfamiliar, Howard attempted to allay his fears. He reassured appellant that Hanger was a "huge, formidable and well-established firm, which used a computerized trading program specially designed to suit the particular needs of the individual customer." Indeed, Howard claimed Hanger "always made money for its clients." Moreover, Howard furnished Saxe with an "Advisory Agreement," prepared by Hanger, indicating that Hanger would "formulate a comprehensive commodities trading program, utilizing diversified trading techniques, custom designed to [Saxe's] available capital and trading objectives." Howard urged Saxe to open his account without delay because Hanger was expected to increase its minimum investment requirement in the near future.

Relying on these assertions, Saxe opened a discretionary commodities trading account with Hanger in January 1983. By June 1983, he had liquidated his Hutton stock account and reinvested approximately $200,000 with Hanger. Moreover, Saxe apparently made a larger investment than he originally intended because of Howard's promise that Saxe would "make ... a million dollars." By September 1983, however, Saxe's Hanger account was in financial difficulty. Concerned over the continued propriety of his investment, Saxe called the firm directly. A Hanger employee insisted that his account was being responsibly managed, and that he would recoup his losses by the end of the year. Thus reassured, appellant decided not to close the account.

Hanger's comforting promises, however, did not materialize. In January 1984, Saxe again called Hanger to voice his dissatisfaction. Ken Hanger, an officer of Hanger Associates, informed Saxe that Hutton should not have solicited, nor should Hanger have opened, Saxe's commodities account. Hanger stated that it was the firm's policy not to accept funds constituting more than 5–10% of an investor's risk capital—a restriction which Saxe's investment had exceeded. Ken Hanger further stated that Hutton was aware of this requirement, and had Hanger known of Saxe's financial situation and investment goals, the firm would have refused to accept Saxe's account.

In subsequent conversations, Howard told Saxe he should be reimbursed for his losses and referred him to Paul Foster, a Hutton attorney. Foster orally conceded

to Saxe that Hutton had placed him in an inappropriate investment program, and tacitly implied that he would be fully reimbursed. In May, 1984, appellant closed his Hanger account, which by that time had lost $130,000. Although he forwarded his records to Foster, expecting he would be reimbursed as suggested, Saxe was never compensated for his losses.

Thereafter, Saxe filed an action against Hutton, Howard and Hanger ("appellees") in the United States District Court for the Southern District of New York, seeking to recover his $130,000 loss plus $1,000,000 in punitive damages. Saxe's amended complaint alleged that he had been fraudulently induced through false representations made by appellees to open the commodities account. Jurisdiction was predicated on the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. 240.10b–5, and the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* He further claimed that the commodities account had been churned, and asserted state law claims of negligence, breach of contractual and fiduciary duties, and infliction of physical and emotional distress.

Appellees moved to dismiss. Judge Carter granted the motion pursuant to Fed.R. Civ.P. 12(b)(6) ruling that Saxe had failed to state a claim under the federal securities and commodities law. He also dismissed appellant's churning claim because it was not pleaded with particularity, Fed.R.Civ.P. 9(b).[1] Accordingly, the district court declined to exercise pendant jurisdiction over the state law claims. We affirm the dismissal of the 10b–5 securities claim. However, we reverse the remainder of the judgment and remand for further proceedings.

■ The essence of Saxe's 10b–5 claim is that he was fraudulently induced to liquidate his Hutton stock portfolio in order to invest those funds in the Hanger discretionary account. Appellant contends that but for the misrepresentations about Hanger, he would not have closed his account at Hutton. This turn of events, Saxe claims, brought his claim within the scope of Rule 10b–5, which requires a fraudulent scheme to be "in connection with" the purchase or sale of a security. Judge Carter rejected this argument because the complaint failed to allege any misrepresentation concerning the securities appellant sold. We agree.

Appellant's argument fails for several reasons. While Saxe may have been financially unable to open an account at Hanger had he not closed his Hutton account, the misrepresentations he alleges relate only to the commodity futures he would invest in through Hanger. Saxe did not allege that appellees misled him concerning the value of the securities he sold or the consideration he received in return. In this regard, our holding in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), is controlling. In finding the pledge of securities as collateral for a loan too remote to satisfy the "in connection with" requirement of 10b–5, Judge Friendly wrote: "The purpose of ... Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that ... sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be." *Id.* at 943. No such deception occurred in this case.

To the contrary, the pleadings indicate that when Saxe sought Howard's advice regarding a conservative, nonspeculative investment, he had already determined that he could no longer bear the continued losses of the Hutton account and desired a superior investment. The complaint is bar-

---

1. In the alternative appellees moved to strike the claim for punitive damages pursuant to Fed. R.Civ.P. 12(f). No action was taken on this motion because the complaint was dismissed in its entirety. In addition, Hanger moved for attorneys' fees pursuant to Rule 11. Judge Carter denied this motion as inappropriate due to the novelty of the questions posed by the complaint.

ren, however, of any representations by Howard concerning the securities account. Accordingly, Judge Carter was correct in holding that the link between the sale of those securities and the opening of the commodities account was too tenuous to satisfy the "in connection with" requirement of Rule 10b–5.

Contrary to appellant's assertion, however, our decision does not signal a retreat from *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967), where we stated that the anti-fraud provisions should be broadly read to prohibit "novel or atypical" fraudulent schemes. The liquidation of Saxe's stock account for reinvestment purposes is a common transaction in securities trading. Any fraud that may have occurred in the reinvestment of those funds with Hanger was merely incidental to the sale of Saxe's securities and, therefore, was not "in connection with" the sale of a security to bring it within the protective ambit of Rule 10b–5.

Accordingly, there is no merit in appellant's 10b–5 claim. Moreover, in light of the Supreme Court's recognition of a private right of action pursuant to section 4b of the Commodities Exchange Act ("CEA"), *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and Congress's amendment of CEA § 25 to endorse such an action, we believe Saxe's remedy, if any, lies within the exclusive jurisdiction of the Commodities Exchange Act. *See Gonzalez v. Paine, Webber, Jackson & Curtis,* [1982–84 Decisions] Comm.Fut.L.Rep. (CCH) ¶ 21,615 (S.D.N.Y.1982); *Reynolds v. Prudential-Bache Securities, Inc.,* [1984–85 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 91,-901 (S.D.N.Y.1985).

Turning to appellant's claim under commodities law, we note that section 4b of the Commodities Exchange Act, 7 U.S.C. § 6b, in language not unlike that contained in Rule 10b–5, declares it to be unlawful for any person to deceive or defraud any other person "in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery ..."[2] Traditionally, courts have looked to the securities laws when called upon to interpret similar provisions of the CEA. Indeed, in *Curran, supra,* where the Supreme Court found that purchasers and sellers of futures contracts had standing to bring an implied right of action for price manipulation under CEA section 4b, it encouraged the federal courts to develop the law of causation and liability under that statute, as the need arises. 456 U.S. at 395, 102 S.Ct. at 1847.

In accordance with his view of the securities laws, the district judge dismissed as non-actionable the statements regarding Hanger's use of computerized services custom-tailored to Saxe's available capital and investment goals. Judge Carter characterized them as mere descriptions of a broker's services rather than misrepresentations concerning "the nature of commodities futures trading or its risks." Accordingly, he found them insufficiently "in connection with" commodities futures con-

---

2. CEA § 4b provides in relevant part:
It shall be unlawful (1) for any member of the contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made or to be made, on or subject to the rules of any contract market ... (A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person....
7 U.S.C. § 6b (1974).

tracts to violate CEA section 4b. *Darrell v. Goodson*, [1979–80 Decisions] Fed.Sec.L. Rep. ¶ 97,349 (S.D.N.Y.1980). In the alternative, the district judge found the statements insufficiently material as a matter of law to support a claim of fraud. *Goldman v. Belden*, 754 F.2d 1059 (2d Cir.1985). On both grounds, we disagree.

Saxe claims he opened the discretionary commodities trading account with Hanger in reliance on appellees's assertions that Hanger was an experienced commodities trading advisor, which would use a sophisticated computerized trading program custom-tailored to his investment objectives. Despite his expressed desire to make only "safe, conservative" investments, Saxe contends his account was traded in highly speculative instruments by inexperienced personnel without reference to any personally tailored computerized program.

In light of the Supreme Court's teaching in *Conley v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–02 (1957), we believe the complaint was erroneously dismissed. We read Saxe's complaint to allege that Howard did indeed misrepresent the degree of risk and highly speculative nature of commodities trading when he reassured appellant that commodities trading would be a safe, non-speculative investment. In analogous contexts, this Court has held similar conduct actionable. In *Psimenos v. E.F. Hutton & Co. Inc.,* for example, where we found jurisdiction to entertain a section 4b cause of action brought by an alien in federal court, we wrote that "material misrepresentations about the nature of the organization handling [an] account, the people [dealt] with,

and the type of trading [the] funds were being used for" would be sufficient to state a cause of action pursuant to the CEA. 722 F.2d 1041, 1043–44 & n. 5 (2d Cir.1983). Moreover, in *Rolf v. Blyth, Eastman Dillon & Co. Inc.,* 570 F.2d 38 (2d Cir.1978), we affirmed the imposition of liability for aiding and abetting fraud where a broker recklessly misrepresented the highly speculative nature of certain securities. *See also Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1241 (S.D.N.Y.1981).

We emphasize, however, that our decision is premised on the discretionary nature of Saxe's account. Appellant, who knew little, if anything, about the commodities market, placed all decisions concerning the purchase and sale of specific futures within the discretion of the appellees. Thus, misrepresentations about the risks of commodities trading affected all subsequent trades made on appellant's behalf.[3] Indeed, the Seventh Circuit has ruled that misrepresentations concerning the record of profitability of a commodities investment firm and the competency of its staff made during the solicitation of a discretionary account, and before trading had begun, may be actionable pursuant to section 4b. *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 103–04 (7th Cir.1977). After considering relevant legislative history, and prior decisions by administrative bodies charged with monitoring the commodities market,[4] the *Hirk* court ascribed a broad interpretation to section 4b. "By its terms, Section 4b is not restricted ... to instances of fraud or deceit 'in' orders to make or the making of contracts. Rather, Section 4b

---

3. The district court cited *Darrell v. Goodson,* [1979–80 Decisions] Fed.Sec.L.Rep. ¶ 97,349 (S.D.N.Y.1980) in support of its ruling that unfulfilled promises about a broker's services cannot meet the "in connection with" requirement of section 4b. The misrepresentations in *Darrell,* however, concerned "most indefinite" promises of conservative management with an emphasis on capital preservation. *Id.* at pp. 97, 324–25. The misleading statements in this case, however, misrepresented the risks of commodities trading. *See Psimenos v. E.F. Hutton & Co., Inc.,* 722 F.2d 1041, 1043–44 & n. 5 (2d Cir. 1983).

4. The Commodities Futures Trading Commission directed the *Hirk* panel to an early decision by the Secretary of Agriculture. In an administrative interpretation of section 4b, the Assistant Secretary of Agriculture concluded that the CEA had been violated by respondents who solicited potential customers to open discretionary accounts through false and misleading advertising. *Secretary of Agriculture v. H.W. Armstrong & Co.,* C.E.A. Docket No. 12 (decided March 11, 1940) (cited in *Hirk, supra,* 561 F.2d at 104 n. 10).

encompasses conduct 'in or in connection with' futures transactions. The plain meaning of such broad language cannot be ignored." *Id.* at 103–04.

■ We agree with the Seventh Circuit that the legislative history of the CEA indicates a congressional awareness that fraudulent conduct can occur during the solicitation of commodities accounts. Of particular significance was the 1968 amendment of section 4b to extend its coverage from "members of the contract market" to "any person" who engages in fraudulent or deceptive conduct "in connection with" futures transactions. The amendment was prompted in part by congressional concern that potential investors had been solicited to trade in the commodities markets through fraudulent representations made by unregulated persons. *See* 113 Cong. Rec. H10981 (Daily ed., Aug. 22, 1967). In advocating the passage of the 1968 amendments, Representative Sullivan of Missouri stated that "[b]rokers are advertising widely these days to get amateurs with some extra cash ... to come into this volatile area of speculative activity." 113 Cong. Rec. H5922 (Daily ed., Dec. 1, 1967).

When Congress substantially amended the CEA in 1974 to confer increased enforcement powers on the Commodity Futures Trading Commission ("CFTC"), the pertinent text of section 4b remained unchanged. Nonetheless, this grant of augmented power was due in part to congressional concern over fraudulent pre-trading conduct. Testimony before the House referred to the "existence of systematic solicitations and bilking of unsophisticated potential customers attracted to non-regulated futures contracts investments by misleading advertising." H.R.Rep. No. 93–975, 93d Cong., 2d Sess. 48–49 (1974).[5]

The legislative history indicates a progressive trend toward broader application of the CEA. At the very least, we believe it illustrates that Congress recognized that fraudulent conduct may occur during the solicitation of potential customers, and intended the CEA to protect investors in this regard. Thus, in conformity with our obligation to "fill in the interstices of the implied cause of action under the CEA," *Curran, supra,* 456 U.S. at 395, 102 S.Ct. at 1848, based on the facts before us, we believe the conduct alleged in Saxe's complaint states a cause of action pursuant to section 4b.

■ Having determined that Saxe's allegations satisfy the "in connection with" requirement of section 4b, we must consider whether the misleading statements were sufficiently material to support a cause of action. In the securities law context, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (U.S. 1976). We see no reason to deviate from this standard in the commodities realm. *See Sudol v. Shearson Loeb Rhoades, Inc.,* [Current Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 22,748 (CFTC Sept. 30, 1985). Moreover, a complaint should not be dismissed as a matter of law unless the alleged misstatements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden, supra,* 754 F.2d at 1067 (dismissal of 10b–5 complaint vacated because alleged omissions were such that a reasonable investor could be misled). *See Conley v. Gibson, supra.* Viewing the alleged misstatements by this standard, we believe they were erroneously dismissed by the district court.

(A) to employ any device, scheme, or artifice to defraud a client or participant or prospective client or participant; or
(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant, or prospective client or participant.

**5.** The *Hirk* court further relied on the enactment of section 205(a) of the Commodities Futures Trading Commission Act of 1974, which prohibits fraudulent solicitations of prospective clients by commodity trading advisors, to support its interpretation of section 4b. 7 U.S.C. § 60 makes it unlawful for a commodity trading advisor to:

Certainly, Howard's representation that Hanger utilized "a computerized trading program specially designed to suit the particular needs of the individual investor," was the type of information that a reasonable investor might rely upon when choosing a trading advisor. *See Bersiko v. Eastern Capital Corp.*, [Current Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,274 (CFTC June 27, 1984). Similarly, the statement contained in the Advisory Agreement that Hanger would "formulate a comprehensive commodities trading program, utilizing diversified trading techniques, custom designed to [appellant's] available risk capital and trading objectives," was one upon which a reasonable investor might rely. Indeed, it is hard to conceive of facts more significant to an investor's decision whether to entrust his funds to the discretion of a commodities trading firm.

Moreover, the assertions by appellees that Saxe's account would be profitable may properly be viewed as further representations of the limited risk and ineffective management of Saxe's commodities account. *See Campo v. Shearson, Hayden Stone, Inc.*, [1982 Decisions] Fed.Sec.L. Rep. (CCH) ¶ 97,517 at 97,727 (S.D.N.Y. 1980) (allegations of fraud pursuant to Rule 10b–5 taken as a whole set forth an actionable claim). Accordingly, we reverse the dismissal of Saxe's commodities claim and remand for further proceedings.

█ Finally, while we agree with the district court that Saxe's complaint delineates only the barest outline of a churning claim, we nonetheless believe it presents the potential for a viable cause of action. Churning occurs when an account has been excessively traded to generate commissions in contravention to the investor's expressed investment goals. Accordingly, such a determination must be made based on the facts of each case. *See Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108 (S.D. N.Y.1984). Appellees have at their disposal the means to trace the history of Saxe's account. Moreover, the specificity of the allegedly excessive trading, in contravention to Saxe's investment objectives, can be developed at the summary judgment stage or at trial. Accordingly, we believe the parties should be permitted to proceed to discovery. *See Bowman v. Hartig*, 334 F.Supp. 1323, 1326–27 (S.D.N.Y.1971). Once discovery is complete, however, there may remain no claim for relief and summary judgment may be pursued, if appropriate. *See Brod, supra*, 375 F.2d at 398. Accordingly, we reverse the dismissal of Saxe's churning claim.

## CONCLUSION

In determining the sufficiency of the complaint before us, we express no opinion on the ultimate success of Saxe's claims. In his complaint, Saxe was neither required to prove he was deserving of recovery, nor called upon to set forth a detailed statement of facts. In conformity with the liberal pleading rules prescribed by the Federal Rules of Civil Procedure, we believe Saxe adequately set forth a plain statement of the events in question and a demand for relief. Fed.R.Civ.P. 8(a).

Accordingly, that portion of the judgment dismissing Saxe's 10b–5 claim is affirmed, and the part dismissing appellant's churning and commodities claims is reversed and the cause remanded for further proceedings not inconsistent with this opinion.