Terje **NILSEN**, Plaintiff,

v.

**PRUDENTIAL–BACHE
SECURITIES**, Defendant.

**No. 90 Civ. 3117 (MBM).**

United States District Court,
S.D. New York.

April 1, 1991.

---

Ambrose M. Richardson, McPheters & Richardson, P.C., New York City, for plaintiff.

Steven L. Ratner, David Buchalter, Rosenman & Colin, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Terje Nilsen, a resident of Monaco, charges that defendant Prudential–Bache Securities, Inc., a "futures commission merchant," lied about and then "churned" his commodity option trading account, and thereby committed fraud in violation of sections 4b and 4o of the Commodity Exchange Act, as amended ("CEA"), 7 U.S.C. §§ 6b, 6o (1990). Nilsen has also brought state law claims for negligence and breach of contract. Essentially, Nilsen alleges that a broker employed by defendant misrepresented the degree of risk to which his account would be subject and then ran the account solely to generate commissions. More specifically, the complaint alleges that during an eight-month period in which plaintiff suffered total trading losses of approximately $2.4 million, defendant earned over $3.2 million in commissions, "mark-ups" or profits from trades executed on both the Chicago Mercantile Exchange and the London Interbank Market.

Defendant has moved for an order (i) to compel arbitration and stay this action, pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, with respect to all claims arising out of transactions which were not executed on, or subject to the rules of, a contract market designated as such under the CEA, and (ii) to dismiss all non-arbitrable claims in their entirety, pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 9(b). For the reasons set forth below, the parties will submit to arbitration all claims not arising from transactions executed on the Chicago Mercantile Exchange. With respect to claims arising out of transactions that were executed on the Chicago Mercantile Exchange, defendant's motion to dismiss is granted in part and denied in part.

I.

The following facts are based on plaintiff's complaint.[1] On August 31, 1988,

1. For purposes of defendant's motion to dismiss, all facts in the complaint are taken as true. *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1244 (2d Cir.1987). Defendant has included with its motion a copy of a signed "Commodity Suitability Letter" in which plaintiff purportedly acknowledged "the inherent risks and high leverage associated with trading in commodity futures" and that "speculating in commodity futures [was] a suitable trading vehicle" for him. Hurley Affidavit, Exh. C. This document submitted by defendant may not be considered by the court on a motion to dismiss because it was neither explicitly incorporated into the complaint by reference nor referred to in the complaint with more than

plaintiff established a commodity trading account with the Monte Carlo office of Prudential–Bache. Before opening the account, Nilsen allegedly told a Prudential–Bache broker, Lien Tah Nguyn, that his investment objectives were preservation of capital and avoidance of excessive risk. Nguyn allegedly assured plaintiff that the account would be both closely scrutinized, and managed so as to realize these investment objectives. Complaint ¶ 6. According to plaintiff, Nguyn warranted that his account would be handled with "the care and supervision accorded to fiduciary accounts." Complaint ¶ 12. The account agreement Nilsen signed to open the account contained the following arbitration clause in paragraph 14:

> .... Any controversy arising out of or relating to my account, to transactions with or for me or to this Agreement or the breach thereof, and whether executed or to be executed within or outside of the United States, *except for any controversy arising out of or relating to transactions in commodities or contracts related thereto executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act, as amended,* shall be settled by arbitration in accordance with the rules then obtaining of either the American Arbitration Association or the Board of Governors of the New York Stock Exchange as I may elect.....

Hurley Affidavit, Exh. B. (emphasis added).

After the account was opened, extensive trading was conducted in futures contracts for U.S. Treasury Bills, British Pounds, Swiss Francs, German Marks, Canadian Dollars, Australian Dollars, and Japanese Yen, on both the International Monetary Market of the Chicago Mercantile Exchange and on the London Interbank Market. Complaint ¶ 7. The complaint alleges that the trading activity in the account bears many of the "earmarks of churning" including "a large amount of day trading, in and out movements in the market, reestablishment of previous positions, retention of losses and trades lacking any apparent rhyme or reason." Complaint ¶ 8. The annualized commissions to average monthly equity ratio allegedly exceeded 80%, while monthly commission to equity ratios sometimes exceeded 100%. Complaint ¶ 9. From mid-September, 1988 to mid-May, 1989, a total of 3,200 currency future trades were executed, Complaint ¶ 6, and between October 1988 and March 1989, the average total number of foreign currency contracts traded for plaintiff's account ranged from approximately 5,000 per month to 12,000 per month. Complaint ¶ 10. During the eight months in which plaintiff's account was active, plaintiff allegedly suffered net total trading losses of approximately $2.4 million, while defendant earned over $3.2 million in total commissions, "mark-ups" or profits. Complaint ¶ 6.

Throughout the trading, the broker employed by defendant "was in complete control of the account" because "[p]laintiff lacked any useful experience or sophistication in futures trading, and was entirely dependent on the broker's recommendations." Complaint ¶ 11. It is alleged that plaintiff was "urged to stay out of the way and allow the broker to trade without distraction or interruption" and that plaintiff suffered his greatest losses while away "on a skiing vacation and largely incommunicado." *Id.* Throughout, plaintiff "was actively misled by his broker as to the state of his account." Complaint ¶ 14. Specifically, in January, 1989, the broker allegedly misled plaintiff as to his equity position so as to induce him to contribute an additional $1 million, whereupon the broker "embarked upon an orgy of trading" during a period when plaintiff "was conveniently away on holiday." Complaint ¶ 15.

Plaintiff filed this action on May 9, 1990. Plaintiff's first claim for relief alleges that defendant, through its broker, churned plaintiff's account by intentionally engaging in excessive trading for the primary

---

"limited quotation." *Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir.1985). Of course, this document and other evidence may be considered on any future summary judgment motion.

purpose of generating commissions. Complaint ¶¶ 17–20. Plaintiff's second claim for relief, entitled "fraud and misrepresentation," alleges that defendant, through its broker, intentionally misrepresented that plaintiff's account would be maintained in a "prudent reasonable manner and with a minimum of risk" in order to induce plaintiff to open the account and make additional contributions. Complaint ¶¶ 21–27. Plaintiff's third claim for relief, entitled "fraudulent concealment," alleges that "Pru–Bache knowingly concealed information concerning the volume and nature of the trading in plaintiff's account which it knew to be excessive and in violation of plaintiff's stated objectives," and that "Pru–Bache also knowingly concealed the true extent of losses resulting from the unauthorized, excessive trading, actively misleading the plaintiff as to the lack of success which defendant's trading strategy has produced, resulting in a continuing fraud upon the plaintiff." Complaint ¶¶ 28–32. Plaintiff's fourth claim alleges that defendant was negligent in handling the account. Complaint ¶¶ 33–35. The fifth claim, entitled "unauthorized trading," alleges that defendant's broker did not obtain prior authorization for either the type or level of trading engaged in. Complaint ¶¶ 36–41. The sixth claim, entitled "breach of contract," alleges that defendant breached a purported contractual obligation to operate plaintiff's account "prudently" and in accordance with "expressed conservative investment goals." Complaint ¶¶ 42–46. The sole jurisdictional allegation in the complaint is that the action arises under §§ 4b and 4o of the CEA, 7 U.S.C. §§ 6b, 6o.

Defendant has moved to compel arbitration with respect to all arbitrable claims—namely, all claims which do not arise from transactions executed on the Chicago Mercantile Exchange. With respect to all non-arbitrable claims—which do arise from transactions executed on the Chicago Mercantile Exchange—defendant has moved to dismiss pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6).

## II.

The Federal Arbitration Act reflects a legislative recognition of " 'the desirability of arbitration as an alternative to the complications of litigation.' " *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987) (quoting *Wilko v. Swan,* 346 U.S. 427, 431, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953)). The Act was "designed to allow parties to avoid the 'costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts.' " *Id.* (citations omitted). Section 2 provides that written agreements to arbitrate controversies arising out of any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 provides for a stay of proceedings where the court is satisfied that the issue before it is arbitrable under the agreement, and § 4 directs a court to order parties to proceed to arbitration where there has been a "failure, neglect, or refusal" of any party to abide by an agreement to arbitrate. 9 U.S.C. §§ 3, 4; *Genesco,* 815 F.2d at 844.

■ When some claims before the court are arbitrable and others are not, a court has no discretion to hear the arbitrable claims, notwithstanding that those claims are based on facts common to the non-arbitrable claims. In *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 1240, 84 L.Ed.2d 158 (1985), the Supreme Court held that the Act "requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possible inefficient maintenance of separate proceedings in separate forums." On the other hand, if a court determines that some, but not all, of the claims before it are arbitrable, it can then determine whether to stay the balance of the proceedings pending arbitration. *Genesco,* 815 F.2d at 844.

■ As with any motion to compel arbitration, the initial task is to determine the scope of the arbitration clause. *Mitsubishi Motors Corp. v. Soler Chrysler–Plym-*

*outh, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). Under federal law, the substantive law governing agreements to arbitrate, the contract is interpreted according to "generally accepted principles of contract law." *Genesco*, 815 F.2d at 845. However, in determining what the parties have agreed to arbitrate, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

■ The arbitration clause at issue in this case provides for arbitration of any controversy relating to plaintiff's account "*except for* any controversy arising out of or relating to *transactions* in commodities or contracts related thereto *executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act....*" (emphasis added). By its terms, the exclusion from arbitration does not depend on the nature of the transaction, but upon where the transaction is executed. Simply put, all controversies that arise out of or relate to transactions in either commodities or commodities contracts are subject to arbitration unless those transactions were either executed on a contract market so designated under the CEA, or executed subject to the rules of such a contract market.

A "contract market" within the meaning of the CEA is limited to a board of trade so designated by the Commodity Futures Trading Commission (CFTC). 17 C.F.R. § 1.3 (1990). Only United States exchanges are eligible for such designation. 17 C.F.R. § 33.4. Therefore, only trades occurring on a market located within the United States could have been executed on a contract market or be subject to the rules of a contract market. *See also Mormels v. Girofinance, S.A.*, 544 F.Supp. 815, 817 (S.D.N.Y.1982) (Weinfeld, J.) (alleged acts of commodities fraud involving foreign residents and transactions occurring almost entirely outside United States not subject to CEA).

The complaint alleges that the trades that generated this controversy took place on both the London Interbank Market and the International Monetary Market of the Chicago Mercantile Exchange. Complaint ¶¶ 7, 9, 13. Purported exclusions from broad arbitration clauses such as this one must be interpreted narrowly, *see AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250–51 (2d Cir. 1991), so the account agreement signed by plaintiff requires that all controversies relating to plaintiff's account be subject to arbitration unless the controversy arises out of or relates to transactions that were executed on the Chicago Mercantile Exchange.

Plaintiff tortures the exclusionary language in the arbitration clause to argue that his dispute with defendant is not subject to arbitration. The relevant part of the clause reads as follows:

> except for any controversy arising out of or relating to transactions in commodities or contracts related thereto executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act

Plaintiff reads the exclusion to encompass two types of controversies: (1) all controversies arising out of or relating to any "transaction[ ] in commodities" whether or not executed on or subject to the rules of a contract market, and (2) all controversies arising out of or relating to transactions in "contracts related [to commodities] executed on or subject to the rules of a contract market." Plaintiff then argues that his dispute is not subject to arbitration because it arises out of or relates to a "transaction[ ] in commodities."

This reading ignores that the phrase "contracts related thereto" modifies "commodities" rather than "transactions." Plaintiff's reading might have some validity if the exclusion clause referred simply to "contracts" rather than "contracts related thereto"—*i.e.* contracts related to commodities. Under plaintiff's reading, the words

"related thereto" would be superfluous, because in fact the only types of contracts that are "executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act" are contracts involving commodities. Furthermore, plaintiff's reading would create an inconsistency within the exclusion clause because arguably any controversy arising out of or relating to a transaction involving a commodity *contract*, whether that transaction is executed on a designated contract market or elsewhere, would also be a controversy arising out of or relating to a "transaction[ ] in commodities." Therefore, under plaintiff's reading, any controversy relating to a transaction in a commodity contract would be exempt from arbitration no matter where that transaction was executed. This would contradict the second part of the exclusion clause which clearly refers only to transactions "executed on or subject to the rules of a contract market."

■ One party's insistence is no reason to strain the meaning of contract language beyond the bounds of reasonable and ordinary grammar. *See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990). Even if an exclusion clause is ambiguous, federal policy "requires us to construe arbitration clauses as broadly as possible" in favor of arbitration, *S.A. Mineracao da Trindade–Samitri v. Utah International, Inc.*, 745 F.2d 190, 194 (2d Cir.1984), and to construe purported exclusions from arbitration as narrowly as possible. *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419. "Arbitration should be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Threlkeld*, 923 F.2d at 250 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)). Therefore, even if the arbitration clause were ambiguous, the exclusion section of that clause, when properly construed, can apply only to disputes that arise directly from transactions that were executed on a contract market, in this case the Chicago Mercantile Exchange.

■ Plaintiff argues also that the arbitration clause is unenforceable because it fails to comply with regulations issued by the CFTC and set forth in 17 CFR Part 180. These regulations require, *inter alia*, that a commodities professional not require a customer to sign an arbitration agreement as a condition for utilizing the services offered by the professional, 17 CFR § 180.3(b)(1), that a customer separately endorse any arbitration clause contained as part of a general customer agreement, 17 CFR § 180.3(b)(2), and that the agreement to arbitrate contain a warning to the customer in bold-face type that he or she may be relinquishing rights to assert claims in court. 17 CFR § 180.3(b)(6). Clearly, the agreement signed by Nilsen did not comply with these regulations. Thus, if those regulations apply to his dispute, the arbitration clause is unenforceable.

This argument also lacks merit. The CFTC arbitration regulations apply only to a "claim or grievance" which is defined to mean a "dispute which arises out of any transaction on or subject to the rules of a contract market...." 17 CFR § 180.1(a). Thus, the regulations apply only to arbitration of disputes with respect to transactions taking place on regulated contract markets. As stated above, the London market is not a regulated contract market. Therefore, the arbitration clause agreed to by plaintiff is valid because by its terms it applies only to controversies other than those arising from transactions executed on contract markets.

This reading of the term "claim or grievance" is confirmed by the CFTC's General Statements of Basis and Purpose with respect to the arbitration regulations:

"The Commission's rules relating to arbitration and other dispute settlement procedures were intended to be and are applicable only to claims or grievances arising out of transactions effected on contract markets—that is, boards of

trade designated as contract markets by the Commission under the Act."

41 Fed.Reg. 42,942, 42,946 (Sept. 29, 1976).

The arbitration regulations are inapplicable also to the extent plaintiff's dispute relates to events occurring before the account was opened, such as defendant's alleged misrepresentations regarding the degree of risk to which the account would be subject. *See Shearson Hayden Stone, Inc. v. Scrivener*, 671 F.2d 680, 684 (2d Cir.1982) (interpreting "claim or grievance" to exclude disputes relating to events prior to opening of trading account).

■ The arbitration clause plaintiff signed did not contain the protective provisions mandated by the CFTC arbitration regulations. But those regulations do not apply to the claims that are subject to the arbitration clause plaintiff signed—*i.e.*, claims not relating to transactions taking place on the Chicago Mercantile Exchange. Indeed, it is possible that the arbitration clause at issue here, with its precise exclusion of controversies relating to transactions executed "on or subject to the rules of a contract market," was specifically designed to exclude the very transactions which would be subject to the CFTC arbitration regulations, and thereby to avoid the strict notice and other requirements of those regulations. *See* page 11, *supra*. As mentioned above, those regulations are inapplicable to disputes arising out of any transaction "on or subject to the rules of a contract market." Nevertheless, the strong federal policy in favor of arbitration requires that an arbitration provision be enforced where applicable unless there are " 'well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract.' " *Rodriguez De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989) (holding that standard arbitration clause is enforceable with respect to claims brought under both Securities Act of 1933 and Securities and Exchange Act of 1934) (quoting *Mitsubishi– Motors Corp. v. Soler Chrysler–Plym-*

*outh, Inc.*, 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)). Plaintiff has not made any "well-supported claims" of fraud or duress as reason to avoid enforcing the signed contract with its arbitration clause. Moreover, even if he did make such claims, those claims themselves would be subject to arbitration. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967); *Dale v. Prudential–Bache Secur., Inc.*, 719 F.Supp. 1164, 1169 (E.D.N.Y.1989).

■ Plaintiff has submitted copies of his monthly account statements as part of his affidavit in opposition to defendant's motion. Each monthly statement is broken out into two separate sections: one entitled "Regulated Statement," which includes only those trades that were executed on a regulated contract market such as the Chicago Board of Trade, and the other entitled "London/Other Statement," which includes trades executed on markets other than those regulated by the CFTC, namely the London Interbank Market. These statements clearly distinguish those transactions which were executed on the London Interbank Market from those which were executed on the Chicago Mercantile Exchange. Although transactions on the two separate markets may have been related parts of a unified trading strategy, the clear terms of the arbitration clause require that all disputes, other than those involving transactions executed on regulated contract markets, be decided by an arbitrator, rather than a court. Therefore, arbitration must be compelled with respect to all of plaintiff's first, third, fourth, fifth, and sixth claims for relief except to the extent the allegations underlying those claims relate directly to trades that were executed on the Chicago Mercantile Exchange. Plaintiff's second claim for relief, which alleges fraud and misrepresentation at the time defendant opened the account or invested additional funds, is not a controversy arising from transactions in commodities or related contracts on any mar-

ket, and is therefore subject, in its entirety, to the arbitration clause.[2]

If a court decides that part of a plaintiff's claims are arbitrable, the court then must decide whether to stay the remaining claims pending arbitration. *Genesco,* 815 F.2d at 844. That decision is largely within the discretion of a trial court as a method of controlling its docket. *See Moses H. Cone,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. An order staying non-arbitrable claims is particularly appropriate if the arbitrable claims predominate and the non-arbitrable claims are of questionable merit. *Genesco,* 815 F.2d at 856. At this time, it cannot be said that the non-arbitrable claims are of questionable merit: the complaint alleges that the ratio of annualized commissions to average monthly equity in plaintiff's account exceeded 80%, and that the ratios of monthly commissions to total equity sometimes exceeded 100%. Furthermore, the CFTC arbitration regulations demonstrate a strong regulatory policy in favor of allowing a party to litigate in a judicial forum any claims arising from transactions executed on a contract market, unless that party has clearly signified an intent to have such claims heard before an arbitrator. Therefore, the non-arbitrable claims will not be stayed, unless it appears in the future that those claims are of questionable merit.

Although this order will split plaintiff's claims between two forums, the possible inefficiency of resulting parallel proceedings is a consequence of the Arbitration Act itself. The possibility of parallel proceedings " 'occurs because the relevant federal law *requires* piecemeal resolution when necessary to effect to an arbitration agreement.' " *Byrd,* 470 U.S. at 221, 105 S.Ct. at 1242 (quoting *Moses H. Cone,* 460 U.S. at 20, 103 S.Ct. at 939) (emphasis in original). However, that does not mean that the arbitration proceeding will gain preclusive effect by default simply because arbitration is normally a faster way to resolve disputes than litigation in federal court. *Byrd,* 470 U.S. at 221, 105 S.Ct. at 1242. *Byrd* makes clear that "[t]he collateral-estoppel effect of an arbitration proceeding is at issue only after arbitration is completed ...," and that "arbitration proceedings will not necessarily have a preclusive effect on subsequent federal-court proceedings." *Id.* at 223, 105 S.Ct. at 1244. At this time, it is impossible to determine what preclusive effect, if any, an arbitral judgment will have on any of plaintiff's claims which remain in federal court. *See Hybert v. Shearson Lehman/American Express, Inc.,* 688 F.Supp. 320, 326 (N.D. Ill.1988) (giving limited preclusive effect to "terse" prior arbitration award).

### III.

With respect to all non-arbitrable claims, defendant has moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and 9(b).

Plaintiff's first, third and fifth claims for relief are labeled "churning," "fraudulent concealment" and "unauthorized trading" respectively. Although the complaint is unclear on this point, based on plaintiff's jurisdictional statement, which contains the complaint's only reference to provisions of the CEA, it appears that plaintiff has used these labels to assert violations of sections 4b and 4o of the CEA, to the extent that these claims differ from his negligence and breach of contract claims. As discussed, *infra* at IV, § 4o of the CEA is entirely inapplicable to plaintiff's claims because that section applies only to "commodity trading advisors" and "commodity pool operators," of which defendant is not alleged to be either. Therefore, to the extent these

---

**2.** Because all of plaintiff's claims arising from transactions executed in London are subject to arbitration, and therefore stayed, it is unnecessary to discuss defendant's alternative arguments that the CEA is inapplicable to offshore transactions by non-U.S. residents, *see De Atucha v. Commodity Exch., Inc.,* 608 F.Supp. 510, 523 (S.D.N.Y.1985), or that the CEA is entirely inapplicable to foreign currency trades on the London Interbank Market. *See* 7 U.S.C. § 2 ("[n]othing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency ..., unless such transactions involve the role thereof for future delivery conducted on a board of trade.").

claims for relief are federal claims, § 4b provides their only conceivable basis.

Section 4b of the CEA provides in relevant part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ...

(A) to cheat or defraud or attempt to cheat or defraud such person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person....

7 U.S.C. § 6b.

The claims brought under § 4b of the CEA are subject to Fed.R.Civ.P. 9(b), which provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."

■■■■■ For purposes of determining whether fraud is pleaded with particularity, the allegations in the complaint are accepted as true. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1244 (2d Cir.1987). In general, to specify fraud with particularity, plaintiffs must allege specifically the circumstances of the fraud claimed, including the content of any alleged misrepresentation, and the date, place and identity of the persons making the misrepresentations. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). With respect to the requirement

that a complaint plead fraudulent intent, "allegations of scienter are sufficient if supported by facts giving rise to 'a strong inference' of fraudulent intent." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990) (quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988)). "Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of a defense; (2) protecting a defendant from harm to his reputation or goodwill and (3) reducing the number of strike suits." *DiVittorio*, 822 F.2d at 1247.

■■■■■ Churning is a type of fraud that is defined as excessive trading in an account controlled by the broker, for the primary purpose of generating commissions, in contravention of an investor's expressed investment goals. *Khalid Bin Talal Bin Abdul Azaiz Al Seoud v. E.F. Hutton & Co.*, 720 F.Supp. 671, 677 (N.D. Ill.1989). Defendants contend that the complaint fails to allege churning with sufficient particularity because it fails either (1) to distinguish between the London and Chicago trades, or (2) to allege which of plaintiff's 3,200 currency future trades were excessive.

■■■■ Although subject to the strictures of Rule 9(b), a churning claim is pleaded with sufficient particularity if facts are alleged from which it may be inferred that an account has been excessively traded in contravention of an investor's expressed goals for the purpose of generating commissions. *See Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 112 (2d Cir.1986). Because of the very nature of this type of claim, a complaint is not required to plead churning with the same degree of particularity as other types of fraud in order to comply with Rule 9(b).

" 'The essence of a churning claim is not a particular trade or group of trades, but rather is the overall amount of trading in the customer's account in light of such considerations as market conditions, size of commissions, and sophistication of

the customer. Because that is so, it would serve no useful purpose to require plaintiffs to list in their pleadings every transaction relevant to their claims. To satisfy the requirements of Rule 9(b) in a claim for churning ..., the complaint instead should identify the [commodities] involved and should contain a statement of facts which is sufficient to, at the very least, permit a rough ascertainment of either the turnover ratio or the percentage of the account value paid in commissions.' "

*D'Addio v. L.F. Rothschild, Inc.*, 697 F.Supp. 698, 703 (S.D.N.Y.1988) (quoting *Polera v. Altorfer, Podesta, Woolard & Co.*, 503 F.Supp. 116, 118–19 (N.D.Ill.1980)).

■ As it now stands, the complaint states "the barest outline of a churning claim," but one which nonetheless survives defendant's motion to dismiss under Rule 9(b). *Saxe*, 789 F.2d at 112. In *Saxe*, the Second Circuit emphasized that the adequacy of a particular churning claim will be based on the particular facts and circumstances of each case. *Id.* Because defendants are generally in the best position to answer the types of questions that may be posed in a Rule 9(b) motion, churning claims should not be dismissed until after discovery so long as the complaint meets the threshold test of pleading sufficient facts from which churning may be inferred. *Khalid Bin Talal*, 720 F.Supp. at 677. As stated in *Saxe:*

Appellees have at their disposal the means to trace the history of Saxe's account. Moreover, the specificity of the alleged excessive trading, in contravention to Saxe's investment objectives, can be developed at the summary judgment stage or at trial. Accordingly, we believe the parties should be permitted to proceed to discovery. Once discovery is complete, there may remain no claim for relief and summary judgment may be pursued, if appropriate.

789 F.2d at 112.

Plaintiff's complaint alleges that his broker, Lien Tah Nguyn, controlled his account and intentionally engaged in excessive trading of contracts involving U.S. Treasury Bills, British Pounds, Swiss Francs, German Marks, Canadian Dollars, Australian Dollars, and Japanese Yen for the primary purpose of generating commissions. Plaintiff further alleges that he informed his broker that his investment goals were preservation of capital and avoidance of excessive risk. To support this claim, the complaint alleges, as mentioned above, that the ratio of annualized commissions to average monthly equity exceeded 800%, that at times the ratio of monthly commission to equity exceeded 100%, and that over a period of about 8 months, defendant's total commissions, mark-ups or profits from trading on plaintiff's account amounted to more than $3.2 million compared to total trading losses of $2.4 million.

Although the above assertions are made without distinguishing between London and Chicago transactions, these allegations, if true, fairly define the outline of a churning claim. On the face of the complaint, one can infer from the extent of alleged commissions as a percentage of plaintiff's average equity, that plaintiff's account may well have been churned. The extent to which plaintiff's churning allegations are applicable to non-arbitrable Chicago transactions, as well as the merits of those allegations can be measured at a later time, after discovery is complete. *See Saxe*, 789 F.2d at 112. At this stage, however, plaintiff has set forth all the elements of a churning claim with the particularity required by Rule 9(b). Therefore, defendant's motion to dismiss this claim is denied.

■ With respect to the plaintiff's claim of fraudulent concealment and unauthorized trading, however, the complaint fails to provide the level of detail required by Rule 9(b).

To support his claim that defendant fraudulently concealed information regarding the true state of his account, plaintiff's complaint makes no more than conclusory allegations to the effect that defendant "knowingly concealed information concerning the volume and nature of the trading in plaintiff's account" and "knowingly con-

cealed the true extent of losses resulting from the unauthorized, excessive trading, actively misleading the plaintiff as to the lack of success which defendant's trading strategy has produced, resulting in a continuing fraud upon the plaintiff." Complaint ¶¶ 30, 31. Although the complaint alleges that the monthly statements sent to plaintiff failed to disclose the extent of commissions and mark-ups charged by defendant, Complaint ¶ 13, a fact that may be relevant with respect to plaintiff's churning claim, it fails to state any particulars with respect to supposed fraudulent misrepresentations about the extent of over-all losses and trading activity in the account. Paragraph 14 of the complaint states no more than that in some way "plaintiff was actively misled by his broker as to the state of his account" while paragraph 15 simply alleges that sometime in January, 1989 the broker misled plaintiff as to the amount of equity in his account.

These allegations fail to state with sufficient particularity the content of alleged misleading misrepresentations, when they were made, or where they were made. The general allegation that "plaintiff was misled" about the status of his account fails to give defendant adequate notice of the nature of plaintiff's claim so that it can frame an answer or mount a defense. It is unclear whether the misrepresentations concern the nature of the commodities traded or merely the mechanics of the transactions, in which case they would not even be actionable under § 4b of the CEA. *Rinfret, Inc., v. Drexel Burnham Lambert, Inc.,* 661 F.Supp. 611, 613 (S.D.N.Y.1987) (Weinfeld, J.). *See also Kearney v. Prudential–Bache Sec., Inc.,* 701 F.Supp. 416, 426 (S.D.N.Y.1988) ("in order for a misrepresentation to be actionable under the ... Commodities Exchange Act, it must be fundamental to the nature of a particular ... commodity trading device"). Accordingly, plaintiff's claim of fraudulent concealment with respect to the non-arbitrable transactions is dismissed with leave to file an amended complaint within 20 days.

Similarly, plaintiff's allegations of unauthorized trading also are not stated with sufficient particularity. The knowing and deliberate execution of unauthorized trades, even if not done out of an evil motive or intent to injure the customer, is a fraud actionable under section 4b of the CEA. *Cange v. Stotler & Co.,* 826 F.2d 581, 589 (7th Cir.1987); *Haltmier v. Commodity Futures Trading Comm'n,* 554 F.2d 556, 560, 562 (2d Cir.1977). But to satisfy Rule 9(b), a claim for unauthorized trading must specify which trades were unauthorized and why they were unauthorized. *Dale,* 719 F.Supp. at 1172.

Unlike plaintiff's churning allegations, which are supported by facts from which one could reasonably infer excessive trading for the purposes of generating commissions, the claim of unauthorized trading is set forth with no more than conclusory allegations that "at no time did the broker seek authorization for the level of trading or the risks with respect to the plaintiff's funds" and that "at no time did the broker obtain authorization or consent to trades where Pru–Bache acted as principal, nor was it ever disclosed to the plaintiff that such trades had occurred." Complaint ¶¶ 40, 41.

Out of 3,200 trades in plaintiff's account, the complaint provides no hint of which trades are unauthorized or in what way specific trades were unauthorized. After reading the complaint liberally and as a whole, it appears that plaintiff has simply asserted that he wanted his account managed in a way that would avoid excessive risk, that the broker promised it would be so managed, and that the account was actually managed in a risky manner resulting in losses. Plaintiff describes this conduct as "unauthorized trading." While this algorithm, if true, may prove breach of contract, breach of fiduciary duty or negligence with respect to defendant's handling of the entire account, to the extent plaintiff's claim for relief is framed as one for unauthorized trading or some other type of fraud actionable under section 4b of the CEA, the complaint fails to plead fraud with the degree of particularity required by Rule 9(b). *See Pross v. Katz,* 784 F.2d 455, 457–58 (2d Cir.1986) (false promise to faithfully manage an account may involve

breach of fiduciary duty, but is not fraud "in connection with" the purchase or sale); *Kearney*, 701 F.Supp. at 427–28 (broker's dereliction in failing adequately to monitor commodities account sounds more in breach of contract than fraud). Therefore, plaintiff's claim of unauthorized trading with respect to Chicago transactions is dismissed with leave to replead within 20 days.

## IV.

▮ As mentioned above, plaintiff asserted in his jurisdictional statement that his claims also arise under § 4o of the CEA.[3] Unlike § 4b of the CEA, which limits liability to fraud "in connection with" a commodity transaction, § 4o imposes liability for a potentially broader range of misconduct. *Kearney*, 701 F.Supp. at 422–23. However, the coverage of section 4o is limited to "commodity trading advisors" and "commodity pool operators." *Id.* Under the CEA a "commodity trading advisor" means:

> "any person who, for compensation or profit, engages in the business of advising others, . . . as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market, . . . or who, for compensation or profit and as part of a regular business, issues or promulgates analyses or reports concerning any of the foregoing; *but such term does not include . . . any . . . futures commission merchant . . .: Provided, That the furnishing of such services by the foregoing person[ ] is solely incidental to the conduct of [its] business or profession.*"

7 U.S.C. § 2 (emphasis added).

A "commodity pool operator" is defined as:

> "any person engaged in the business which is of the nature of an investment trust, syndicate, or similar form of enter-

prise, and who, in connection therewith, solicits, accepts, or receives from others, funds securities or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market, but does not include such persons not within the intent of this definition as the commission may specify by rule or regulation or by order."

7 U.S.C. 2.

Essentially, a commodity pool operator is one who manages an investment fund, similar to a mutual fund, in which the assets of several investors are invested together with gains or losses shared pro rata by the participants. *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 884 (9th Cir.1986).

Plaintiff's complaint alleges only that Prudential–Bache was a "Futures Commission Merchant." Complaint ¶ 16. Nor can it be inferred from the allegations in the complaint either that defendant was a "commodity pool operator" with respect to the conduct at issue or that the advice given by defendant "was more than 'incidental to the conduct of'" its regular business or profession so that defendant could be considered a "commodity trading advisor" in addition to a "futures commission merchant." *See Markowitz v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 579 F.Supp. 124, 127 (S.D.N.Y.1984). Therefore, to the extent that plaintiff's claims allege violations of section 4o of the CEA, they are dismissed.

## V.

▮ Plaintiff's remaining non-arbitrable claims for relief allege negligence and breach of contract with respect to transactions executed on the Chicago Mercantile Exchange. Although defendant correctly argues that such claims are not cognizable under § 4b of the CEA, which has a scien-

---

**3.** Section 4o of the CEA forbids "commodity trading advisors" and "commodity pool operators" from "employ[ing] any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or . . . en-

gag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant . . ." 7 U.S.C. § 6o.

ter requirement, *Kearney*, 701 F.Supp. at 416, it is apparent, *see* Plaintiff's Memorandum of Law at 28, that these are state claims and that plaintiff is asking the court to exercise pendent jurisdiction over those claims.[4] *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Although the jurisdictional section of the complaint alludes only to federal jurisdiction under 28 U.S.C. § 1331, there is no need specifically to plead pendent jurisdiction when it is clear that plaintiff's federal and state claims derive from a "common nucleus of operative fact" and that trying all non-arbitrable claims in one judicial proceeding will promote convenience and sound judicial administration. *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237, 241 (D.N.J.1976); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1207 (1969 & 1989 Supp.).

## VI.

In summary, defendants motion to compel arbitration is granted with respect to plaintiff's first, third, fourth, fifth and sixth claims for relief, except to the extent those claims relate to transactions executed on the Chicago Mercantile Exchange. Arbitration is also compelled with respect to all of plaintiff's second claim, alleging fraud and misrepresentation. As to non-arbitrable transactions executed on the Chicago Mercantile Exchange, plaintiff's third and fifth claims for relief are dismissed for failure to plead fraud with particularity. Defendant's motions to dismiss plaintiff's churning claim under § 4b of the CEA and his pendent state claims as to those transactions executed on the Chicago Mercantile Exchange are denied.

SO ORDERED.

---

4. Plaintiff also asserts that there is diversity jurisdiction because he is a "resident" of Monaco while defendant is a "resident" of a New York. Plaintiff's Memorandum of Law at 28. However, the diversity statute requires that the civil action be between *"citizens* of a state and *citizens* ... of a foreign state[.]" 28 U.S.C. § 1332(a)(2). Therefore, unless plaintiff pleads that he is a "citizen" of a foreign state, there is no diversity jurisdiction. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir.1990) (United States citizens domiciled abroad may not sue in diversity).