**DANNY'S CONSTRUCTION COMPANY, INC.,**
**Plaintiff,**

v.

**BIRDAIR, INC., Defendant.**

No. 00–CV–0064C(SR).

United States District Court, W.D. New York.

Sept. 28, 2000.

Brown & Kelly, LLP (Frederick D. Turner, of counsel), Buffalo, NY, for plaintiff.

Saperston & Day, P.C. (William A. Lundquist, James P. Domagalski, of counsel), Buffalo, NY, for defendant.

## INTRODUCTION

CURTIN, District Judge.

On January 19, 2000, plaintiff Danny's Construction Company, Inc. ("DCCI") commenced the present action against defendant Birdair, Inc. ("Birdair") and asked that the court "temporarily and permanently" enjoin the arbitration that Birdair has recently demanded of DCCI. Item 1, p. 9 (Complaint). Immediately after filing its complaint, DCCI filed motions for a preliminary injunction and summary judgment. Item 2. By its motion for a preliminary injunction, DCCI seeks to prevent Birdair from proceeding with its arbitration demand. By its motion for summary judgment, DCCI seeks permanent injunctive relief regarding that same arbitration demand.

At oral argument, the court learned that a date had not yet been set for the arbitration, and that the American Association of Arbitration ("AAA") intended to await this court's decision before setting such a date.

On January 31, 2000, Birdair was ordered to file its responses to DCCI's complaint and motions. Item 6. Accordingly, Birdair filed an answer on February 22, 2000, Item 9, and then filed various opposing papers on March 1, 2000. Items 10–11. DCCI has since had an opportunity to reply. Item 12. On April 14, 2000, oral argument was heard on DCCI's motions for preliminary and permanent injunctive relief. Having considered the parties' arguments, DCCI's motion for a preliminary injunction and its motion for summary judgment are denied.

---

1. The subcontract between Birdair and DCCI is referred to throughout the order simply as "the subcontract."

## Facts

### I. Overview

The court takes this opportunity to set forth a brief summary of the rather complicated background—both factual and legal—that surrounds the present litigation. Ultimately, this action arises out of defendant Birdair's contract to rebuild the roof of the Montreal Olympic Stadium ("the Stadium"). For the purposes of this litigation, there are several players involved: (1) *Regies de Installations Olympiques* ("*RIO*") (a non-party): the public agency in Canada that maintains the Montreal Olympic Stadium; (2) *Birdair* (the defendant here): RIO's prime contractor on a project involving reconstruction of the Olympic Stadium's roof; (3) *DCCI* (the plaintiff here): one of Birdair's principal subcontractors on the Project, put in charge of demolishing the old roof and erecting the new one ("the Project");[1] (4) *American Metal Works* ("*AMW*") (a non-party): another one of Birdair's subcontractors on the Project, made responsible for building and delivering steel trusses to the Project's work site; (5) *Montacier, Inc.* (a non-party): Birdair's sub-subcontractor and DCCI's subcontractor, made responsible for meeting DCCI's labor needs on the Project.

For reasons that are discussed in greater detail *infra*, work on the Project was delayed several times over the course of many months. DCCI and Birdair disagreed about which party was responsible for these delays. Ultimately, DCCI and Birdair had a falling-out, and Birdair dismissed DCCI as a subcontractor.

### II. The Subcontract & the Project

More specifically, RIO hired Birdair to design and reconstruct the Stadium's roof

in June 1997. *See* Item 3, Exh. C, Att. 5. As prime contractor, Birdair subcontracted with plaintiff DCCI in August of 1997 for the demolition and reconstruction of the Stadium's roof. *See* Item 3, ¶ 8. The present litigation arises out of Birdair and DCCI's subcontract ("the subcontract"). The subcontract required DCCI to "furnish all engineering, supervision, labor, equipment, small tools and temporary rigging to demolish and dispose of the existing roof and install" the various components that were needed to create the new roof. Item 3, Exh. B, ¶ A. The subcontract also required Birdair to provide DCCI with all of the components—the "steel, cables, fabric and fabric accessories"—that would be needed to build the new roof. *Id.*

Being based in Minnesota, DCCI found it necessary to sub-subcontract its labor needs to Montacier, Inc. ("Montacier"), which is a construction firm based in Montreal. Item 3, ¶ 9. Under the terms of this sub-subcontract, Montacier promised to provide DCCI with the labor needed to complete the Project. Item 3, Exh. C, Att. 7, p. 1.

As prime contractor, Birdair developed the design for the new roof. *See* Item 3, ¶¶ 10–14. This design required DCCI to construct a net of interwoven steel cables, and to attach specialized fabric to those steel cables. *See* Item 3, Exh. C, Att. 8 (diagram of design).

In February of 1998, DCCI and Birdair reached an agreement regarding the necessary schedule for demolishing and rebuilding the Stadium's roof. *See* Item 3, ¶ 25 and Exh. C, Atts. 12, 17. As a result of certain scheduling difficulties, *see id.* and Item 3, ¶¶ 17–21, DCCI later notified Birdair of its intent to assert claims for the costs associated with the delays and the accelerated schedule that the delays necessitated. *See id.* ¶ 22 and Exh. C, Att. 14.

In addition to these apparent scheduling problems, DCCI contends that Birdair repeatedly failed to deliver the new roof's components in a timely manner. *See* Item 3, ¶¶ 26–27, 29 and Exh. C, Atts. 19–20. Specifically, DCCI claims that Birdair delinquently delivered the steel trusses which were to be erected around the perimeter of the stadium as support for the roof. *See id.* ¶ 26–27; Item 3, Exh. C, Att. 20 (detailing dates when trusses were scheduled to arrive and when they were actually received).

Birdair had entrusted American Metal Works, Inc. ("AMW") with the job of building these steel trusses ("the AMW-made steel trusses"). *See* Item 3, Exh. A, pp. 4–5.

### III. Birdair Declares DCCI in Default

By September of 1998, it was clear that the Project was well behind schedule. Ultimately, DCCI indicated that it would not press forward with its work unless Birdair agreed to finance the costs associated with an accelerated work schedule. *See* Item 3, ¶ 32. Birdair initially agreed to cover these costs. *See* Item 3, Exh. J, ¶¶ 11–12. However, this agreement soon fell apart. On October 30, 1998, DCCI sent Birdair a letter by facsimile in which DCCI accused Birdair of managing the prime contract incompetently and of committing several material breaches of the subcontract. *See id.* Exh. C, Att. 10. DCCI insisted that Birdair's failure to uphold its end of the subcontract had caused injurious delays to DCCI. *See id.*

This falling-out between DCCI and Birdair gave rise to three separate lawsuits, which were commenced in the civil courts of Quebec. DCCI commenced the first Quebec-based action ("Action No. 1") in early December 1998. *See* Item 3, ¶ 40 and Exh. C. In Action No. 1, DCCI has

sued Birdair over damages allegedly incurred by DCCI because of Birdair's failure to deliver the roof's components to the work site on time and because of Birdair's inability to coordinate work on the Project "so as not to disrupt" DCCI's operations. Item 3, ¶ 39; *see also id.*, Exh. C, Part V ("The Claim"). Birdair commenced the second Quebec-based action ("Action No. 2") in early March 1999. *See* Item 3, Exh. G. In Action No. 2, Birdair has sued DCCI over DCCI's alleged failure to pay *Montacier* approximately $2,250,000 (Canadian funds or "CDN") for labor costs incurred by Montacier on the Project. *See* Item 3, ¶ 41 and Exh. G.[2] Finally, Birdair commenced the third Quebec-based action ("Action No. 3") in late October 1999. *See* Item 3, Exh. J. In Action No. 3, Birdair has essentially asserted that DCCI breached the subcontract by its "unacceptable slow progress in performing the work." *Id.* ¶ 14; *see also id.* ¶¶ 5–9, 22.

While each of these three Quebec-based actions was still pending, Birdair served a demand for arbitration on DCCI in late December 1999. *See* Item 3, Exh. A. Birdair made this demand for arbitration on DCCI pursuant to the arbitration clause that appears in the subcontract.

> In the event of a dispute between Birdair and [DCCI], Birdair may elect to arbitrate such dispute in the manner provided below, or to litigate the dispute in a forum with jurisdiction to decide the dispute. Any arbitration proceedings shall be conducted in accordance with the Construction Industry Rules of the American Arbitration Association, provided however, that only one arbitrator shall hear the dispute. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

Item 3, Exh. B, Terms and Conditions of Subcontract, XI, D. Thus, the subcontract gave Birdair an exclusive right to elect arbitration over litigation. In addition, the subcontract provided that the "exclusive venue for any . . . arbitration . . . shall be in the jurisdiction in which Birdair's home office is located." *Id.* at XI, G. Birdair's home office is in Amherst, New York. Birdair's arbitration demand was apparently the result of the fact *that AMW* had served a demand for arbitration on Birdair in late 1999. *See* Item 11, ¶ 8; Item 3, Exh. A.

By its arbitration demand, AMW has alleged that Birdair breached its subcontract with AMW by failing to pay for the AMW-made steel trusses.[3] *See* Item 3, Exh. A, pp. 4–5. In its answer to AMW's demand, Birdair has offered the following defense: "In its lawsuit, DCCI alleges, among other things, late deliveries and defective materials by AMW causing damages to DCCI. Therefore, further payments to AMW have been withheld pending determination of any culpability AMW may have as to DCCI's claims." *Id.* at 8.

In light of its arbitration with AMW, Birdair has limited the scope of the arbitration demand that it served on DCCI: "For purposes of the matters in dispute between Birdair and DCCI, this Demand for Arbitration is limited to solely such claims by DCCI as arise from steel fabrications supplied by AMW to Birdair on the Montreal Olympic Stadium roof replace-

---

**2.** In Action No. 2, Birdair is the plaintiff, not Montacier, because it was Birdair that paid Montacier $2,000,000 CDN in order to ensure that work on the Project would continue after Birdair had dismissed DCCI from the work site. *See* Item 3, ¶ 8 and Exh. G, ¶ 7.

**3.** AMW has also claimed that Birdair breached its contract with AMW by providing AMW with defective designs for those steel trusses. *See* Item 3, Exh. A, pp. 4–5.

ment project." Item 3, Exh. A, p. 3. By making this demand on DCCI, Birdair states that it seeks "a single forum for resolution of liabilities among the three parties (Birdair, DCCI, and AMW)...." Item 11, ¶ 8.

## Discussion

### I. Preliminary Injunction

#### A. Legal Standard

█ Whether DCCI is entitled to a preliminary injunction barring Birdair from proceeding in arbitration against DCCI shall be addressed first. In the Second Circuit,

> a district court may grant a preliminary injunction where the moving party establishes: (i) that it is likely to suffer irreparable injury if the injunction is not granted, and (ii) either (a) a likelihood of success on the merits of its claim, or (b) the existence of serious questions going to the merits of its claim and a balance of the hardships tipping decidedly in its favor.

*Beal v. Stern,* 184 F.3d 117, 122 (2d Cir. 1999). The issue of irreparable injury is discussed *infra* at Part I, B of the Discussion. The second issue—the likelihood of DCCI's success on the merits—is taken up later in Part II of the Discussion, where the merits of the parties' summary judgment arguments are discussed at length.

#### B. Irreparable Injury

█ "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.... In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez ex rel. Rod-*

*riguez v. DeBuono,* 175 F.3d 227, 233–34 (2d Cir.1999) (quotation and citation omitted).

Here, DCCI insists that it would be irreparably injured by: (1) participating in two parallel proceedings with regard to the same issues, which have arisen from the same subcontract and the same Project; (2) facing the prospect of conflicting judgments from arbitration in New York and litigation in Montreal; and (3) expending valuable time and resources on an arbitration in which DCCI has no direct interest.

1. *Contesting inter-related issues in separate forums.*

█ DCCI's first alleged threat of irreparable injury is ambiguous and not fully developed in its papers. *See* Item 5, p. 6. Apparently, DCCI claims it will face the irreparable harm of pulling apart issues of law and fact when those issues are inextricably tied *together.*[4] Under this interpretation, DCCI seems to argue that it cannot protect its interests in the Quebec-based litigation if it must extract issues out of that litigation so that they can be resolved separately in arbitration.

> The litigation in Canada ... involves mutual claims of breach of the August 14, 1997 subcontract. The gravamen of [the] claims [there] is the parties' dispute over ..., among other things, ... BIRDAIR's failure to deliver several categories of components to the work site on time and in proper sequence.... The steel trusses, apparently fabricated by AMW, are only one such category of roofing component.

---

4. It is possible that DCCI is arguing it will face the irreparable harm of contesting the same facts and legal issues in two separate proceedings. Yet, such an interpretation would make this theory no different from

DCCI's other two theories, *i.e.,* the harm of conflicting determinations and the harm of being forced to waste resources on an arbitration in which DCCI has no interest. *See infra.*

*The delays in providing the AMW fabricated steel perimeter trusses to the job site are part of a complex and interrelated sequence of events which gives rise to the entire claim between BIRDAIR and DCCI....*

Item 5, p. 5 (emphasis added).

However, even under this interpretation, DCCI cannot demonstrate the threat of irreparable injury. "Arbitration must be allowed to proceed even if it would result in 'the possibly inefficient maintenance of separate proceedings in different forums,'...." *Graphic Scanning Corp. v. Yampol*, 688 F.Supp. 857, 859 (S.D.N.Y.), *aff'd*, 850 F.2d 131 (2d Cir.1988) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)); *see also Nilsen v. Prudential–Bache Securities*, 761 F.Supp. 279, 288 (S.D.N.Y.1991). DCCI created the possibility of simultaneously litigating and arbitrating with Birdair by giving Birdair a unilateral right to arbitrate disputes that arose from the subcontract. The threat of "parallel proceedings" does not represent the threat of irreparable injury.

### 2. *Conflicting determinations.*

■ DCCI also alleges that proceeding in both arbitration and litigation could subject DCCI to the irreparable injury of "contradictory determinations of issues of fact and/or matters of law and ... disparate ... judgments." Item 5, p. 6. Birdair contends that arbitration does not threaten DCCI with the prospect of inconsistent judgments because any determination from the arbitration would bind both DCCI and Birdair under the doctrine of *res judicata.* Item 10, p. 4.

An AAA arbitrator's findings could only bind DCCI and Birdair in their Quebec-based litigation pursuant to the law that governs the proceedings in Montreal. Neither DCCI nor Birdair, however, has made a legal argument on the effect that American arbitration would have on subsequent litigation in a civil court sitting in Montreal, Canada.[5]

■ Yet, even if DCCI is facing the possibility of conflicting judgments, this court would not have the authority to stay arbitration. *Cf. Blue Bell, Inc. v. Western Glove Works, Ltd.*, 1993 WL 404006, at *1–2 (S.D.N.Y. Oct. 4, 1993). That is, DCCI is not seeking to preserve the status quo. That is, not only are there no conflicting judgments threatening DCCI at this time, there are also *no* judgments at all.[6] Much like in the case of *Western Glove*, this court refuses to take a decision away from the Montreal court by prematurely deciding what effect an arbitration award could have on the Quebec-based litigation. DCCI has not demonstrated how the possibility of conflicting judgments can represent the actual and imminent threat of irreparable injury.

### 3. *Wasted resources on meaningless arbitration.*

■ Finally, DCCI argues that it faces the irreparable injury of "wast[ing] materi-

---

5. The Second Circuit has, in certain contexts, "previously granted preclusive effect to findings made by arbitration boards." *Benjamin v. Traffic Executive Ass'n Eastern Railroads*, 869 F.2d 107, 114 (2d Cir.1989) (citing cases). However, Second Circuit case law, while persuasive, does not directly control the present inquiry.

6. In order to demonstrate a legitimate threat of irreparable injury, the "movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995) (quotation marks and citation omitted). Here, DCCI has failed to demonstrate that the threat of conflicting judgments is "actual and imminent."

al resources on [the arbitration] when it has no direct interest in the determination of those issues." Item 5, p. 6. Here, DCCI insists that it has no stake in the arbitration involving Birdair and AMW and that Birdair has demanded arbitration of DCCI for the sole purpose of manipulating the venue of Birdair's arbitration with AMW. *See id.* Birdair insists that the DCCI claim regarding the AMW-made steel trusses is highly relevant to the AMW–Birdair arbitration because Birdair's defense against AMW's claim is that DCCI has asserted a claim for Birdair's failure to deliver the AMW-made steel trusses to the work site on time. *See* Item 10, p. 4.

Birdair's arbitration demand will not require DCCI to participate in an arbitration in which it has no interest. While DCCI may not be concerned with the apportionment of liability between Birdair and AMW, Birdair has demanded arbitration of *DCCI's claim* that arises from Birdair's alleged failure to deliver the AMW-made steel trusses in a timely manner. DCCI definitely has a direct interest in its own claim regarding the AMW-made steel trusses. Birdair's arbitration demand will not irreparably injure DCCI by forcing DCCI to waste resources on arbitration in which it has no direct interest.

In light of the foregoing, DCCI has failed to demonstrate that it will be irreparably injured by Birdair's arbitration demand. DCCI's motion for a preliminary injunction is denied. *See Rodriguez*, 175 F.3d at 234–35 ("In the absence of a show-ing of irreparable harm, a motion for a preliminary injunction should be denied.").

## II. Summary Judgment & Likelihood of DCCI's Success on Merits

### A. Court Has No General Authority to Stay Arbitration

■ Although the parties have not raised the issue, the court notes that it is *not* vested with a general authority to stay arbitration proceedings in order to allow related litigation to run its course. *See Elzinga & Volkers, Inc. v. LSSC Corp.*, 838 F.Supp. 1306, 1314–15 (N.D.Ind.1993); *cf. Lippus v. Dahlgren Mfg. Co.*, 644 F.Supp. 1473, 1481 (E.D.N.Y.1986).

### B. Alleged Waiver of Right to Arbitrate

■ The federal policy favoring arbitration is well recognized. *See, e.g., Kramer v. Hammond*, 943 F.2d 176, 178 (2d Cir. 1991). Courts may infer a waiver of a party's right to arbitrate only under certain circumstances.

#### 1. *Federal law governs issue of waiver.*

■ Although both parties cite New York case law to support their arguments regarding Birdair's alleged waiver of its right to arbitrate,[7] it is federal law, not state, that governs the inquiry into whether a party has waived its right to arbitration. *See Graphic Scanning Corp. v. Yampol*, 850 F.2d 131, 133 (2d Cir.1988). Thus, the parties' reliance on state law is of little help.

---

7. *See* Item 5, pp. 11–12 (DCCI Memorandum); Item 10, p. 6 (Birdair Memorandum). DCCI relies on *Esquire Industries, Inc. v. East Bay Textiles*, 68 A.D.2d 845, 414 N.Y.S.2d 336 (1st Dep't 1979), for the proposition that "parties who initiate litigation as plaintiffs have repeatedly been found to have waived their right to arbitrate a dispute based solely on their commencement of litigation." Item 5, p. 11. Birdair, on the other hand, cites *Stewart Becker, Ltd. v. Horowitz*, 94 Misc.2d 766, 405 N.Y.S.2d 571 (Sup.Ct., Suffolk 1978), to support the argument that a party's "participation in the litigation does not waive the right to arbitration" where "the arbitration involves the same parties who are involved in the litigation, but concerns a separate matter . . . ." Item 10, p. 6.

## 2. Birdair's conduct in Quebec–Based Litigation Has Not Effected a Waiver.[8]

### a. Action No. 1

A party is deemed to waive its right to arbitrate if it "engages in protracted litigation that results in prejudice to the opposing party." *S & R Co. of Kingston v. Latona Trucking,* 159 F.3d 80, 83 (2d Cir. 1998). The determination of waiver depends on the particular facts of each case. *See PPG Industries, Inc. v. Webster Auto Parts, Inc.,* 128 F.3d 103, 107–08 (2d Cir. 1997). In *Kingston,* the Second Circuit set forth several factors that should be considered in order to determine whether there has been a waiver: (1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation, including any exchanges of pleadings, substantive motions, and discovery; and (3) proof of actual prejudice, including taking advantage of pretrial discovery not available in arbitration, merito-

rious motions against one's adversary, and undue delay. 159 F.3d at 83. However, the final factor of actual prejudice is the most critical: "[T] here can be no waiver unless [the party's] conduct has resulted in prejudice to the ... party [seeking to avoid arbitration]." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 26 (2d Cir.1995).

### (i) Lapse of time

Just over one year elapsed between the commencement of Action No. 1 and Birdair's demand for arbitration.[9] While this lapse in time could weigh in favor of finding a waiver, "the mere passage of time cannot be relied upon as a waiver of the right to arbitrate." *American Exp. Financial Advisors, Inc. v. Zito,* 45 F.Supp.2d 230, 235 (E.D.N.Y.1999). Instead, this court must consider delays in conjunction with the amount of litigation that occurred during that period and any

---

**8.** Only Action No. 1 is truly relevant to the issue of Birdair's alleged waiver, since Birdair has demanded arbitration of DCCI only with respect to *"such claims by DCCI* as arise from steel fabrications supplied by AMW to Birdair on the Montreal Olympic Stadium roof replacement project." Item 3, Exh. A, p. 3. This point of clarification is important because it dispels the confusion caused by an erroneous argument urged by Birdair. Essentially, Birdair argues as follows: (a) Birdair's arbitration demand against DCCI only concerns Birdair's effort to resolve AMW's claims against Birdair; (b) none of the three actions in Montreal involves AMW's claims against Birdair; (c) therefore, the Quebec-based litigation could not possibly be a source of Birdair's waiver of its right to arbitrate AMW's claims against Birdair. *See* Item 10, p. 8. Birdair misses the mark every time it makes this argument. *See, e.g.,* Item 11, ¶¶ 4–7 (exemplifying Birdair's argument on this issue); *see also* Item 12, ¶¶ 6–13 (containing DCCI's argument on this issue). It is irrelevant that AMW's claims against Birdair have not been litigated in the Montreal actions. Instead, the relevant issue is whether the Que-

bec-based litigation includes the DCCI claim that arises from Birdair's alleged failure to deliver the AMW-made steel trusses on time. On this score, DCCI has specifically alleged in Action No. 1 that it incurred damages because Birdair was "systematically ... late with deliveries" of the AMW-made steel trusses. Item 3, Exh. C, ¶ 77; *see also id.* ¶¶ 78–81, 89–92. Therefore, the DCCI claim, which arises from Birdair's alleged failure to deliver the AMW-made steel trusses, *is* in fact part of Action No. 1.

**9.** DCCI commenced Action No. 1 on or around December 9, 1998, in a district court of Montreal, *see* Item 3, Exh. C, and Birdair demanded arbitration of DCCI on December 30, 1999. *See id.* Exh. A. The court rejects Birdair's argument that the relevant time period is the lapse of time between *AMW's demand* for arbitration and Birdair's demand on DCCI. For the same reasons discussed in Part II, B, 2, a of the Discussion, *supra,* the relevant time period is the lapse between Action No. 1 and Birdair's demand for arbitration against DCCI.

proof that DCCI was prejudiced by Birdair's conduct during that period. *See Leadertex,* 67 F.3d at 25.

### (ii) *Extent of litigation*

The record reveals that in March of 1999, Birdair made a "motion for particulars and communication of documents" ("motion for particulars") in the context of Action No. 1. *See* Item 3, Exh. D. Apparently, such a motion in the Quebec courts is akin to a demand for a bill of particulars in New York practice or to a set of interrogatories in federal practice. *See* Item 3, ¶ 40. In August of 1999, DCCI filed a response to Birdair's motion for particulars. Item 3, Exh. E.

Beyond Birdair's motion for particulars and DCCI's response, the record contains no evidence of any litigation in Action No. 1. In fact, Birdair's Stanley Kopaskie has averred that "there has been no discovery or disclosure whatsoever to date on the merits in any of the litigated proceedings in Quebec, nor are there demands for either pending responses...." Item 11, ¶ 9. Since Birdair and DCCI have engaged in only "relatively minor" litigation in Action No. 1, *see Thyssen v. M/V Markos N,* 1999 WL 619634, at *7–8 (S.D.N.Y. Aug.16, 1999), Birdair's conduct in Action No. 1 has not effected a waiver of Birdair's right to demand arbitration. "Where parties who assert a right to arbitration have made relatively little use of their presence in a judicial proceeding, courts almost invariably decline to find waiver." *Acquaire v. Canada Dry Bottling,* 906 F.Supp. 819, 829 (E.D.N.Y.1995).

### (iii) *Prejudice*

■ Finally, with respect to prejudice, "[s]ufficient prejudice exists where a party

against whom waiver is asserted: (1) engages in discovery procedures not available in arbitration, (2) makes motions going to the merits of an adversary's claims, or (3) delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." *Satcom Int'l Group PLC v. Orbcomm Int'l Partners,* 49 F.Supp.2d 331, 340 (S.D.N.Y.1999), *aff'd* 205 F.3d 1324, 1999 WL 1254091 (2d Cir.1999).

In this case, the record contains no evidence that DCCI has suffered actual prejudice because of Birdair's failure to demand arbitration until December of 1999. First, Birdair has not used litigation's broad scope of discovery in order to secure information that would have been unavailable in arbitration. In fact, Birdair has only secured a response to a motion for particulars in Action No. 1. Such basic and preliminary information could also have been discovered under the Construction Industry Dispute Resolution Procedures of the American Arbitration Association ("the AAA Rules").[10] Thus, DCCI has not shown that it has been prejudiced by Birdair's abuse of litigation-based discovery.

In addition, Birdair has not made any dispositive motions against DCCI in Action No. 1. Thus, DCCI has not suffered prejudice for that reason.

Third, although Birdair waited over a year before it demanded arbitration of DCCI, the record contains no evidence indicating that DCCI has incurred undue expenses in prosecuting Action No. 1. Admittedly, DCCI did respond to Birdair's motion for particulars, but there is no indication that DCCI incurred unnecessary costs in drafting that response. In fact,

---

10. The AAA Rules of Procedure provide for limited discovery: "[T]he arbitrator may direct (i) the production of documents and other information, and (ii) the identification of any witnesses to be called." American Arbitration Association, Construction Industry Dispute Resolution Procedures, R–10 (1999).

DCCI's response will continue to serve its interests throughout Action No. 1, which is still ongoing. Moreover, Birdair's delay in demanding arbitration of DCCI is understandable in light of the fact that AMW did not demand arbitration of Birdair until December of 1999. *See* Item 11, ¶ 8.

b. Action No. 3

In arguing that Birdair has waived its right to demand arbitration, DCCI often refers collectively to its suit against Birdair (Action No. 1) and Birdair's breach of contract suit against DCCI (Action No. 3).

 In Action No. 3, Birdair has alleged that it incurred damages because of DCCI's failure to perform the work that DCCI agreed to do. DCCI will seek to raise several affirmative defenses in Action No. 3, among them: Birdair's failure to deliver the AMW-made steel trusses on time. DCCI argues that Birdair has waived its right to demand arbitration because Birdair has already commenced litigation that *deals with* DCCI's claim arising from the AMW-made steel trusses. Yet, this DCCI claim will be an affirmative defense in Action No. 3, not a claim. There is no law to indicate that Birdair could waive its right to demand arbitration of this DCCI claim by commencing litigation that will involve that claim as an affirmative defense.

In any event, DCCI still fails to show it has been prejudiced by Birdair's conduct in Action No. 3. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 88 F.Supp.2d 168, 178 (S.D.N.Y.2000) ("[E]ven a party that initiates litigation does not waive its right to demand arbitration, absent a finding of prejudice.") (citing *Zwitserse Maatschappij Van Levensverzekering En Lijfrente v. ABN Int'l Capital Markets Corp.*, 996 F.2d 1478, 1479 (2d Cir.1993)).

In light of the foregoing, Birdair, in participating in Action No. 1 and Action No. 3, has not waived its right to demand arbitration of the DCCI claim that arises from Birdair's alleged failure to deliver the AMW-made steel trusses on time. Thus, in addition to its failure to show irreparable injury, DCCI has also failed to show a likelihood of prevailing on the merits. DCCI's motion for a preliminary injunction is denied on this ground as well.[11]

**C. Prohibition Against Splitting Claims**

 "[T]he doctrines against splitting a cause of action and claim preclusion [are] not ... distinct, but rather two sides of the same coin. Thus the doctrine against splitting a cause of action is simply another name for res judicata." *Prisco v. State of N.Y.*, 1992 WL 88165, at *13 (S.D.N.Y. Apr.22, 1992) (citing *Haphey v. Linn*

---

**11.** As an aside, DCCI's extensive reliance on Judge Cote's decision in *Satcom Int'l Group PLC v. Orbcomm Int'l Partners,* 49 F.Supp.2d 331 (S.D.N.Y.1999), is rejected. *Satcom* is not apt precedent for two reasons. First, the court in *Satcom* did not reproduce the actual language of the arbitration agreement between the parties. Therefore, that court's decision is based on the unknown wording of those licensing agreements. Moreover, *Satcom* is factually distinct from the present one because Birdair has not "jumped back and forth" between litigation and arbitration in the same way that Satcom did. Rather, it

was DCCI that commenced litigation against Birdair in Action No. 1, and it is Birdair that now demands arbitration of one of DCCI's claims in Action No. 1. *Satcom* is also inapposite to the present action on its waiver analysis. Unlike Satcom, Birdair did not secure over 9000 pages of documents from its adversary before demanding arbitration. Further, Birdair has not made a dispositive motion against DCCI and has not participated in a settlement conference with the court in Montreal. *Cf. Satcom,* 49 F.Supp.2d at 339–340 (describing Satcom's extensive litigation).

*County,* 924 F.2d 1512, 1517 (9th Cir. 1991)). " 'Under modern principles of res judicata, a party cannot split [its] claim by first seeking one type of remedy in one action and later asking for another type of relief in a second action.' " *Bloomquist v. Brady,* 894 F.Supp. 108, 115–16 (W.D.N.Y. 1995) (citing *Headley v. Bacon,* 828 F.2d 1272, 1276 n. 3 (8th Cir.1987); and *Restatement (Second) of Judgments* §§ 24 and 25).

DCCI argues that it is entitled to summary judgment because Birdair's demand for arbitration represents an impermissible attempt to split its claim against DCCI. DCCI maintains that Birdair's failure to deliver the AMW-made steel trusses is a claim that the parties have already raised in the Quebec-based litigation. Furthermore, DCCI argues that the issue of the AMW-made steel trusses is an inseparable part of a "complex and interrelated fact pattern involving [many] connected issues as to the performance of the subcontract ... and [therefore] cannot be ... split off from" the litigation in Montreal. Item 5, p. 13.

In making this argument, DCCI paints in very broad strokes and fails to address a critical point: Birdair has *not* demanded that DCCI arbitrate part of a claim that Birdair has against DCCI; rather, Birdair has demanded that DCCI arbitrate part of a claim that DCCI has against Birdair. Specifically, Birdair has demanded that DCCI arbitrate DCCI's claim that arises from the AMW-made steel trusses. Thus, Birdair has not split its own claim against DCCI.

■ Admittedly, Birdair's arbitration demand will likely result in DCCI's contesting related issues of fact in two different forums. However, the inconvenience and difficulty associated with addressing related issues in separate litigation and arbitration do not preclude the enforcement of an arbitration agreement. "[T]he possible inefficiency of resulting parallel proceedings is a consequence of the Arbitration Act itself. The possibility of parallel proceedings 'occurs because the relevant federal law requires piecemeal resolution when necessary to effect to an arbitration agreement.' " *Nilsen,* 761 F.Supp. at 288 (quoting *Byrd,* 470 U.S. at 221, 105 S.Ct. 1238). DCCI's argument that Birdair's arbitration demand represents an impermissible attempt at claim-splitting is. rejected.

## Conclusion

DCCI's motion for a preliminary injunction is denied because DCCI has failed to demonstrate that it will be irreparably harmed by Birdair's arbitration demand and has also failed to show a likelihood of success on the merits of its action to enjoin arbitration permanently. This court does not have general authority to stay arbitration in the interests of economy of effort or convenience; Birdair has not waived its right to demand arbitration of DCCI; and Birdair's arbitration demand does not amount to claim-splitting. Therefore, DCCI's motion for summary judgment is also denied.

So ordered.